UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEVIN LINDKE,

                 Plaintiff,

vs.

JAMES R. FREED
in his individual and official capacities,

                 Defendant.

Case No. 2:20-cv-10872

Hon. Mark A. Goldsmith
Magistrate Judge:
Hon. David R. Grand

_____

PHILIP L. ELLISON (P74117)
Outside Legal Counsel PLC
Attorney for Plaintiff
PO Box 107
Hemlock, Michigan 48626
(989) 642-0055
pellison@olcplc.com

TODD J. SHOUDY (P41895)
VICTORIA R. FERRES (P78788)
Fletcher Fealko Shoudy & Francis, P.C.
Attorneys for Defendant
1411 Third Street, Suite F
Port Huron, Michigan 48060
(810) 987-8444
tshoudy@fletcherfealko.com
vferres@fletcherfealko.com

_____

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant James R. Freed, by and through his attorneys, Fletcher Fealko Shoudy & Francis, P.C., and hereby moves this Court for summary judgment pursuant to Fed R. Civ. P. 56 for the reasons stated in the accompanying Brief.

The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter expressly denied concurrence.  I, Todd J. Shoudy, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

<div style="margin-left:40%">

FLETCHER FEALKO
SHOUDY & FRANCIS, P.C.
By:  / Todd J. Shoudy
Fletcher Fealko Shoudy & Francis, P.C.
Attorney for Defendant
1411 Third Street Suite F
Port Huron, Michigan 48060
(810) 987-8444
Michigan Bar #41895
tshoudy@fletcherfealko.com

</div>

DATED:  February 17, 2021

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KEVIN LINDKE,

                Plaintiff,

vs.

JAMES R. FREED
in his individual and official capacities,

       Defendant.

Case No. 2:20-cv-10872

Hon. Mark A. Goldsmith
Magistrate Judge:
Hon. David R. Grand

_____

PHILIP L. ELLISON (P74117)
Outside Legal Counsel PLC
Attorney for Plaintiff
PO Box 107
Hemlock, Michigan 48626
(989) 642-0055
pellison@olcplc.com

TODD J. SHOUDY (P41895)
VICTORIA R. FERRES (P78788)
Fletcher Fealko Shoudy & Francis, P.C.
Attorneys for Defendant
1411 Third Street, Suite F
Port Huron, Michigan 48060
(810) 987-8444
tshoudy@fletcherfealko.com
vferres@fletcherfealko.com

_____

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## **<u>TABLE OF CONTENTS</u>**

**Page No.**

STATEMENT OF QUESTIONS PRESENTED……………………………  ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ……………  iv

INDEX OF AUTHORITIES…………………………………………………  v

INTRODUCTION……………………………………………………..…  1

STATEMENT OF UNDISPUTED FACTS….………………………………  2

ARGUMENT……………………………………………………………… 8

     I.     PLAINTIFFS' CLAIMS FAIL BECAUSE DEFENDANT
           WAS NOT ACTING UNDER THE
           COLOR STATE LAW…………..…………………….......... 8

     II.    IN THE ALTERNATIVE, PLAINTIFF'S FIRST
           AMENDMENT CLAIMS FAIL BECAUSE THE
           FACEBOOK PAGE IS NOT A PUBLIC FORUM……............ 15

     III.   DEFENDANT IS ENTITLED TO QUALIFIED
           IMMUNITY ON THE DAMAGES CLAIMS………………… 18

     IV.   PLAINTIFF'S OFFICIAL CAPACITY CLAIM
           AGAINST MR. FREED FAILS…………………………… 20

     V.    PLAINTIFF'S CLAIMS FOR INJUNCTIVE AND
           DECLARATORY RELIEF FAIL…………………………… 22

CONCLUSION………………………………………………………….... 25

i

<u>**STATEMENT OF QUESTIONS PRESENTED**</u>

<u>**Question No. 1:**</u>

Whether Defendant was engaged in state action when he deleted Plaintiff's comments and blocked Plaintiff from Defendant's personal Facebook page?

Defendant states the answer is: "No"
Plaintiff states the answer is: "Yes"

<u>**Question No. 2:**</u>

Whether Defendant's Facebook page is a public forum?

Defendant states the answer is: "No"
Plaintiff states the answer is: "Yes"

<u>**Question No. 3:**</u>

Whether Defendant is protected by qualified immunity?

Defendant states the answer is: "Yes"
Plaintiff states the answer is: "No"

<u>**Question No. 4:**</u>

Whether Plaintiff's official capacity claims are barred because he cannot show a policy or custom of the City of Port Huron was involved in Defendant's decision to delete comments or block Plaintiff?

Defendant states the answer is: "Yes"
Plaintiff states the answer is: "No"

**<u>Question No. 5</u>:**

Whether Plaintiff's injunctive and declaratory relief claims fail because an official City Manager Facebook page does not exist?

Defendant states the answer is: "Yes"
Plaintiff states the answer is: "No"

**<u>Question No. 6</u>:**

Whether Plaintiff's injunctive and declaratory relief claims fail because they are moot, as Defendant has not operated a Facebook page in nearly a year?

Defendant states the answer is: "Yes"
Plaintiff states the answer is: "No"

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

*Redding v. St. Eward*, 241 F.3d 530 (6th Cir. 2001)

*Helms v. Zubaty,*  495 F.3d 252 (6th Cir. 2007)

*Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019)

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

*Lewis v. Clarke*, 137 S. Ct. 1285, 1292; __ U.S. __ (2017)

iv

# INDEX OF AUTHORITIES

**Cases**

*Akers v. McGinnis*,
   352 F.3d 1030 (6th Cir. 2003) ...............................................................24

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999). ...........................................................................9, 15

*Ammex, Inc. v. Cox*,
  351 F.3d 697 (6th Cir. 2003) ..................................................................24

*Bandler v. Town of Woodstock*,
   No. 2:18-CV-00128, 2019 U.S. Dist. LEXIS 188820,
   (D. Vt. Oct. 31, 2019) ............................................................................25

*Brown v. Montoya*,
   662 F.3d 1152 (10th Cir. 2011) .............................................................22

*Demis v. Sniezek*,
   558 F.3d 508 (6th Cir. 2009) .................................................................24

*Garner v. Memphis Police Dep't*,
   8 F.3d 358 (6th Cir. 1993) .....................................................................21

*Garnier v. Poway Unified Sch. Dist.*,
   No. 17-CV-2215-W (JLB), 2019 U.S. Dist. LEXIS 167247
   (S.D. Cal. Sept. 26, 2019) ......................................................................20

*Gay v. Cabinet for Health & Family Servs. Dep't*,
   No. 18-5285, 2019 U.S. App. LEXIS 2336 (6th Cir. Jan. 23, 2019) .................. 23

*German v. Eudaly*,
   No. 3:17-CV-2028-MO, 2018 U.S. Dist. LEXIS 109151
   (D. Or. June 29, 2018) ................................................................. 12, 13

*Good News Club v. Milford Central Sch.*,
    533 U.S. 98 (2001). ............................................................................18

*Green v. Mansour*,
    474 U.S. 64 (1985) ............................................................................24

*Greenawalt v. Ind. Dep't of Corr.*,
    397 F.3d 587 (7th Cir. 2005) .............................................................22

*Gregory v. Shelby Cnty.*,
    220 F.3d 433 (6th Cir. 2000). ............................................................21

*Hafer v. Melo*,
    502 U.S. 21 (1991) ...................................................................... 21, 22

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982). ..........................................................................18

*Helms v. Zubaty*,
    495 F.3d 252 (6th Cir. 2007). ...........................................................17

*Hudgens v. NLRB*,
    424 U.S. 507 (1976) ..........................................................................11

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*,
    515 U.S. 557 (1995) ..........................................................................12

*Jones v. Goord*,
    435 F. Supp. 2d 221 (S.D.N.Y. 2006) ...............................................24

*Kentucky v. Graham*,
   473 U.S. 159 (1985).........................................................................21

*Lewis v. Clarke*,
   137 S. Ct. 1285; __ U.S. __ (2017)....................................................23

*Malley v. Briggs*,
   475 U.S. 335 (1986).........................................................................19

*McGuire v. Strange*,
   83 F. Supp. 3d 1231 (M.D. Ala. 2015) ..............................................22

*Miller v. City of Cincinnati*,
   622 F.3d 524 (6th Cir. 2010). ................................................... 15, 16

*Miller v. Davis*,
   No. 15-5880, 2015 U.S. App. LEXIS 23060 (6th Cir. Aug. 26, 2015)...............23

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985).........................................................................18

*Nat'l Collegiate Ath. Ass'n v. Tarkanian*,
   488 U.S. 179 (1988)...........................................................................9

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
   460 U.S. 37 (1983)...........................................................................15

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009).........................................................................14

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*,
   501 F.3d 592 (6th Cir. 2007) ...........................................................21

*Redding v. St. Eward*,
   241 F.3d 530 (6th Cir. 2001) ...........................................................10

*Reichle v. Howards*,
   566 U.S. 658 (2012) ................................................................................19

*Small v. Brock*,
   963 F.3d 539 (6th Cir. 2020) ...............................................................24

*Stengel v. Belcher*,
   522 F.2d 438 (6th Cir. 1975) ...............................................................10

*United States v. Classic*,
   313 U.S. 299 (1941) ................................................................................9

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) ................................................................................22

*Wilson v. Layne*,
   526 U.S. 603 (1999) ..............................................................................18

*Windom v. Harshbarger*,
   396 F. Supp. 3d 675 (N.D. W. Va. 2019). ..........................................14

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ..............................................................................12

**Statutes**

42 U.S.C. § 1983 ........................................................................... 8, 20, 24

U.S. Cons. Art. III, § 2. ...........................................................................24

**Rules**

Fed. R. Civ. P. 56. .................................................................................. 25

**INTRODUCTION**

Plaintiff, Kevin Lindke, filed the present lawsuit on April 9, 2020 against James Freed in his individual and official capacity alleging that when Mr. Freed deleted posts made on Mr. Freed's personal Facebook page and blocked Plaintiff from making additional posts, Mr. Freed violated the First Amendment to the United States Constitution (ECF No. 1; PageID.2, 11-12 [¶¶4-5,46-48]).  Mr. Freed has been employed by the City of Port Huron since 2014 in the unelected position of City Manager (Freed dep., p. 9; attached as Ex. 1).  From approximately 2008, before his hire by the City of Port Huron, until the Fall of 2020, Mr. Freed maintained his own personal Facebook account titled "James Freed" with the username "JamesRFreed1" (see Facebook page printout attached as Ex. 2).  The City of Port Huron does not have a Facebook account for the City itself, and while it has official accounts for two departments, it does not have one for the Office of the City Manager.

In Count I, Plaintiff alleges that Mr. Freed's Facebook page was a "public forum" or a "limited public forum", and the deletion of comments violates the First Amendment (ECF No. 1; PageID.13, ¶52).  In Count II, Plaintiff alleges that "banning users" "solely due to their viewpoint" from their ability to communicate on the "public forum" also violates the First Amendment (Id at PageID.14, ¶57). Plaintiff claims that these actions by "Defendant Freed in his official capacity is a policy or custom sufficient to impose liability pursuant to *Monell*" (Id PageID.13,

15 [¶¶54, 61]).   The lawsuit requests declaratory and injunctive relief, nominal damages, actual damages, and punitive damages (Id at PageID.15-16, [¶62]).

Discovery being complete, Defendant James Freed now files his motion for summary judgment under FRCP 56 on the following bases:

1. Plaintiff cannot establish that there was "state action" involved in Mr. Freed's operation of his personal Facebook page, which is a necessary element of a First Amendment claim.

2. Even if it is assumed, *arguendo*, that there is state action, the City Manager's Facebook Page is a nonpublic forum, and the restrictions drawn on Plaintiff's speech were reasonable.

3. Defendant is entitled to qualified immunity on the damages claim because the law regarding government officials' use of social media is not clearly established.

4. Plaintiff cannot establish a *Monell* claim.

5. Plaintiff's claims for injunctive and declaratory relief are barred because (1) injunctive and declaratory relief is not available against a defendant in his individual capacity; (2) the Court has no occasion to order relief against the Facebook account of an official City Manager page that does not exist; and (3) Plaintiff's claims are moot because the Facebook Page is unpublished with no plans to reactivate it.

## <u>STATEMENT OF UNDISPUTED FACTS</u>

1.     James Freed created a personal Facebook account with the name "James Freed" and username "JamesRFreed1" while he was in college (prior to 2008) (Freed dep., pp. 6-7, 29).   The number of Facebook "friends" he had approached 4,000 to 5,000 (Id).

2.      Facebook profiles have a 5,000 friend limit.  Somewhere between 2011 and 2013, Facebook allowed a user to convert his or her profile to a Facebook "page," which has no limit.  Mr. Freed was given that option and converted his personal account to a "page," which allowed him to exceed the 5,000 friend limit (Freed dep., pp.  7-8, 22; see also Ex. 2).

3.      Mr. Freed was hired by the City of Port Huron in June 2014 as its City Manager, an unelected position (Freed dep., p. 9)

4.      The Port Huron Police Department operates a page named "Port Huron Police Department" and the City Parks and Recreation Department operates a page named "City of Port Huron Parks & Recreation Department" (see Ex. 3).  The police department page expressly states that it is "the official Port Huron Police Department Facebook Page" and contains the Port Huron Police emblem (Ex. 3).

5.      The City of Port Huron itself; however, does not own or operate an official City Facebook page or an account for the City Manager.  As Mr. Freed testified, he only wanted a personal Facebook page, not an official city manager Facebook page (Freed dep., pp. 18-19).

6.      Although the "About" section of Mr. Freed's personal Facebook page includes a link to the city website and a city email contact, it describes him as "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI" (Ex. 2).

7.      When Mr. Freed converted his account to a page, he was required to

3

choose a category for his page (Freed dep., pp. 23-24).  The categories from which

he was required to choose included "Public & Government Service," "Restaurant,

"Public Figure," "Politician," "Government Official," or "Musician."  Mr. Freed

chose "Public Figure" because he believed none of the other categories fit (Freed

dep., pp. 23-24).

8.     Mr. Freed's Facebook page's "profile picture" was a picture of himself,

his wife, and his daughter.  The "cover photo" was a publicly available video that

was made to promote downtown Port Huron available on the "Downtown Port

Huron" Facebook page (see Exhibit 2).

9.     Mr. Freed is the sole administrator of his Facebook page and the only

person with access to it (Freed dep., p. 18-19).  Thus, no City employee operates or

maintains the Facebook page "JamesRFreed1" (Id).   The City of Port Huron

provided no support, monetary or otherwise, for Mr. Freed's Facebook page and has

no involvement with his page (Freed dep., pp. 18-19).  Moreover, Mr. Freed has

never accessed the Facebook page on any City device (Freed dep., p. 15, 18-19).

10.    Mr. Freed is the only person with the ability to make a post on the page.

Facebook users can view his posts and make a comment in response to one of his

posts, unless they are "blocked" from making comments (Id).

11.    The vast majority of Mr. Freed's Facebook posts were about personal

matters, such as his family, as opposed to City related matters.  A review of the posts

shows the following breakdown:

4

| Date | Personal | City | COVID | Total | Percent Personal | Percent COVID |
|------|----------|------|-------|-------|------------------|---------------|
| Mar-19 | 25 | 8 | 0 | 33 | 75.76% | |
| Apr-19 | 24 | 10 | 0 | 34 | 70.59% | |
| May-19 | 29 | 12 | 0 | 41 | 70.73% | |
| Jun-19 | 24 | 9 | 0 | 33 | 72.73% | |
| Jul-19 | 24 | 7 | 0 | 31 | 77.42% | |
| Aug-19 | 21 | 4 | 0 | 25 | 84.00% | |
| Sep-19 | 18 | 12 | 0 | 30 | 60.00% | |
| Oct-19 | 34 | 6 | 0 | 40 | 85.00% | |
| Nov-19 | 24 | 5 | 0 | 29 | 82.76% | |
| Dec-19 | 19 | 6 | 0 | 25 | 76.00% | |
| Jan-20 | 12 | 8 | 0 | 20 | 60.00% | |
| Feb-20 | 16 | 6 | 0 | 22 | 72.73% | |
| Mar-20 | 29 | 10 | 20 | 59 | 49.15% | 33.90% |
| Apr-20 | 33 | 5 | 15 | 53 | 62.26% | 28.30% |
| May-20 | 10 | 4 | 2 | 16 | 62.50% | 12.50% |

(see Facebook posts, attached as Ex. 4).

12.    The personal posts include: a post about his daughter throwing a birthday party for his family dog (May 7, 2020); a post showing pictures of Mr. Freed and his daughter at a Daddy Daughter Dance (February 6, 2020); a post wishing his wife a happy anniversary (August 4, 2019); and a post about his family trying out a new restaurant in Port Huron (October 16, 2019) (Id). Mr. Freed testified, "I've shared every -- the majority are family photos, pictures of my dog" (Freed dep., p. 13).

13.    As to City-related posts, Mr. Freed testified that he has not used Facebook to make any original announcements; everything he posted was already announced elsewhere and readily available to the public (Freed dep., pp. 10-11).

14.    The posts about the City include a post sharing a press release he released as City Manager regarding incorrectly mailed water bills (April 25, 2020) and a post about town hall meetings he held for employees regarding the City's Comprehensive Financial Plan (September 20, 2019) (Ex. 4).

15.    In March 2020, much like the rest of the Facebook community, Mr. Freed began posting about the COVID-19 pandemic.   Most of the posts were informative in nature.   For example, Mr. Freed shared the St. Clair County Health Department's COVID-19 data and press releases; the City's COVID-19 Resource Page (April 2, 2020); and the City Recreation Department's virtual class offerings (March 20, 2020) (Ex. 4).

16.    Notably, many other Facebook users shared the same COVID-19 posts that Mr. Freed shared on his Page.   For example, on March 31, 2020, Mr. Freed shared the following post from the St. Clair County Health Department's Page.   105 other Facebook users shared this post as well:



17.    Although there were one or more occasions where Mr. Freed answered a question made in a comment, Mr. Freed never directed any of his posts to City

residents (see Ex. 4).  Mr. Freed never requested feedback from any City residents on his posts, never held any "Q&A" sessions on his page, and never opened up his page for back and forth public dialogue (see Ex. 4).  Mr. Freed has never executed any of his official duties on his Facebook page (Freed dep., pp. 18-19).

18.    Mr. Freed acknowledged that he has blocked numerous people from his Facebook page over the years and deleted posts when he did not like the content of the posts because he considered it his personal account (Freed dep., p. 15).

19.    Plaintiff admitted that prior to March 2020 he made Facebook posts on other accounts that contain personal attacks against Mr. Freed (Lindke dep., p. 49; attached as Exhibit 5).  Mr. Freed does not dispute that he deleted posts by Plaintiff on his page and blocked him:  "I just remember one time he wrote like three weird smiley faces, and that was like the first time I saw him on my page.· And to be quite honest, I was really creeped out, because I had been aware of other things in this community where he had essentially stalked people, harassed people, lots of PPOs and records.  So when I block your client, I blocked him not on what he -- because I can't really recall anything he posted. I blocked him specifically on who he was. And I know what he's done in the community to some school employees and other stuff, so I blocked him just on who he was.  I can't recall besides the three smiley faces anything that he specifically wrote" (Freed dep., p. 17).

20.    Plaintiff claims that he commented on posts on Mr. Freed's Facebook Page four to six times from three different accounts he owns until Mr. Freed deleted

the comments and blocked the accounts (Lindke dep., p. 23; attached as Ex. 5).

21.     Plaintiff then requested the 9,000 members of his Facebook group "Through My Eyes" also make posts. Mr. Freed does not dispute that he deleted several other posts that he believed were connected with Plaintiff (Freed dep., p. 17; Lindke dep., p. 36).

22.     Mr. Freed continued to maintain his Facebook page until April 2020 when it was involuntarily deactivated by Facebook without explanation (Freed dep., p. 25). Mr. Freed went through the steps to reactivate the account and it was back up in June 2020 (Id) Shortly thereafter, it was disabled again without explanation and became available again in October 2020, at which time Mr. Freed unpublished the page (Id). Mr. Freed testified that he has no plans to reactive his Facebook page: "If it is not going to be a private page, I don't want it. I don't want to have -- I wouldn't put photos of my family out there. I wouldn't put photos of my kid out there if I didn't have the ability to control it like a personal page. So it is un-published. Nobody can find it" (Id at 18-19, 26).

## ARGUMENT

### I.     PLAINTIFF'S CLAIMS FAIL BECAUSE DEFENDANT WAS NOT ACTING UNDER THE COLOR OF STATE LAW

To state a claim under Section 1983, the plaintiff must show (1) that the defendant acted under the color of state law; and (2) the offending conduct deprived the plaintiff of rights secured by federal law. 42 U.S.C. § 1983. State action is found

where a public official acts in a way that a private citizen would not have been able to act, but not every action performed by a government official exercises "some right or privilege created [or imposed] by the State." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). A public official acts "under color of state law" when he "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Nat'l Collegiate Ath. Ass'n v. Tarkanian*, 488 U.S. 179 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

Here, Mr. Freed operated his Facebook account as a private citizen, and not under his authority as City Manager. Thus, Plaintiff cannot prove the necessary state action to support his claim. *Contra Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235-236 (2d Cir. 2019) (evidence showed "substantial and pervasive government involvement with, control over, the [Twitter] account" where White House staff members were involved in the drafting and posting of tweets to the Account and witnesses acknowledged that the President's tweets are official statements of the President that were required to be preserved as official records under the Presidential Records Act); *see id.* (Park, J., dissenting from the denial of rehearing en banc) ("The [Second Circuit] opinion ignored an important part of the state-action test by failing to consider whether the President exercised "some right or privilege created by the State" when he blocked Plaintiffs from his personal Twitter account.") (Ex. 6).

9

Unlike former President Trump's Twitter account in *Knight First Amendment Inst.*, Mr. Freed did not use governmental employees and resources in the operation of his Facebook page or make it an official part of a governmental record. At most, he reposted information that was already published elsewhere, the same as any other citizen could do. As demonstrated above, some of his posts included re-posting St. Clair County Health Department information that was also re-posted by dozens of others.

There is no dispute that the JamesRFreed1 Facebook account is a privately owned account. To convert a private entity's actions into state action, the government must have traditionally and exclusively performed the function, which is not the case with Mr. Freed's Facebook account. *Manhattan Cmty. Access Corp. v. Halleck*, __ U.S. __; 139 S. Ct. 1921, 1928-29 (2019) (reversing the Second Circuit and holding that operations of public access channels on a cable system did not constitute state action). *Compare Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001) (off duty police officer did not act under the color of state law when he made 911 calls to report a crime because her actions were "functionally equivalent to that of any private citizen calling for police assistance"), *with Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975) (off-duty and non-uniformed police officer acted under the color of state law when shooting and killing an individual in an altercation because he used his service weapon and followed a department policy to take action when witnessing criminal activity 24 hours per day).

10

It follows that "when a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor." *Halleck*, 139 S. Ct. at 1930.  A private entity that opens a forum for speech is entitled to "editorial discretion over the speech and speakers in the forum."  *Id.* (citing *Hudgens v. NLRB*, 424 U.S. 507 (1976).  As the Supreme Court explained, the reason for this is obvious:

> If the rule were otherwise, all private property owners and private lessees who open their property for speech would be subject to First Amendment constraints and would lose the ability to exercise what they deem to be appropriate editorial discretion within that open forum. **Private property owners and private lessees would face the unappetizing choice of allowing all comers or closing the platform altogether.**  "The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use."  Benjamin Franklin did not have to operate his newspaper as "a stagecoach, with seats for everyone."  That principle still holds true. As the Court said in *Hudgens*, to hold that private property owners providing a forum for speech are constrained by the First Amendment would be "to create a court-made law wholly disregarding the constitutional basis on which private ownership of property rests in this country."  The Constitution does not disable private property owners and private lessees from exercising editorial discretion over speech and speakers on their property.

*Id.* at 1930-31 (internal citations omitted); *Knight*, 928 F.3d 226 (Park, J., dissenting from the denial of rehearing en banc) ("Such a rule would preclude government officials from discussing public matters on their personal accounts without converting all activity on those accounts into state action.").

This is the exact situation facing Mr. Freed.  He has a personal account that he has used for years to primarily post family related matters, including pictures of

his wife and young child.  Facebook can unilaterally shut the account down, which it did at various times throughout 2020.  As Mr. Freed explained, he never intended this account to be an official account and would shut it down if he were forced to allow all comments, including personal attacks against himself and his family[1].

Similar to this case, the Oregon District Court analyzed the state action requirement in the context of a city commissioner's Facebook page when the city commissioner blocked a political activist.  *German v. Eudaly*, No. 3:17-CV-2028-MO, 2018 U.S. Dist. LEXIS 109151 (D. Or. June 29, 2018) (attached as Ex. 7).  Like Mr. Freed's Facebook account, the Commissioner's posts included references to city matters.  The Court, nonetheless, concluded that such posts did not transform the private Facebook account into state action:

> **Commissioner Eudaly's post about events that occurred while she was working does not transform her non-official page into a page operated under color of state law.** *Cf. Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 711-14 (E.D. Va. 2017) (holding that a Facebook account was operated in an official capacity where, among other things, the official referred to the page as her "County" page; used the page as a tool of governance; promoted the page in a county newsletter; included her official title on the page; addressed posts to

---

[1] Requiring municipal employees to make such a choice will have a chilling effect on all municipal employees' free speech rights and they should not be forced to decide between the "unappetizing choice of allowing all comers," including cyberbullies, onto their Facebook pages or closing their social media accounts altogether. *See Halleck*, 139 S. Ct. at 1930; *see e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (recognizing a First Amendment right to "avoid becoming the courier for" the unwanted message of another); *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 574 (1995) (speakers have "autonomy to control one's own speech," including the right "to exclude a message [one does] not like from the communication [one chooses] to make.").

constituents; and categorized the page as an official government page). Likewise, that Commissioner Eudaly only knows Ms. German through Commissioner Eudaly's government role does not turn her action into state action. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996) (police officer did not act under color of state law when he robbed plaintiffs, although he identified his victims during police search of their home).

*Id.* at *15-16.

The Court distinguished the facts in *Knight First Amendment Institute* for the

same reasons applicable to Mr. Freed:

Ms. German highlights *Knight First Amendment Institute v. Trump*, No. 17 Civ. 5205, 302 F. Supp. 3d 541, 2018 U.S. Dist. LEXIS 87432, 2018 WL 2327290 (S.D.N.Y. May 23, 2018), but that case is distinguishable. In *Knight*, the court held the President's Twitter account constituted a public forum [citation omitted]. The court declined to engage in a traditional state action analysis; addressing the state action question, it reasoned that because "facilities or locations deemed to be public forums are usually operated by governments, determining that a particular facility or location is a public forum usually suffices to render the challenged action taken there to be state action subject to First Amendment limitations." *Id.* (quoting *Halleck v. Manhattan Cmty. Access Corp.*, 882 F.3d 300, 306-07 (2d Cir. 2018). And the court emphasized that "[b]ecause the President and [the White House Social Media Director] use the [Twitter account] for governmental functions, the control they exercise over it is accordingly governmental in nature." [citation omitted]. **Here, by contrast, the alleged public form is not "operated by governments" but by Ms. Eudaly in her personal capacity, so I find the state action analysis appropriate.** *See also id.* ("No one can seriously contend that a public official's blocking of a constituent from her purely personal Twitter account—one that she does not impress with the trappings of her office and does not use to exercise the authority of her position—would implicate forum analysis."). Under that analysis, as explained above, I find that Ms. German has not sufficiently alleged that state action.

*Id.* at \*\*14-17 (emphasis added); *see also Windom v. Harshbarger*, 396 F. Supp. 3d 675, 684-85 (N.D. W. Va. 2019).

Under the foregoing principles, Mr. Freed's actions taken on his Facebook page were actions taken by Mr. Freed as a private citizen. Mr. Freed opened the account 6 years before becoming the City Manager for his personal use as a private citizen. After becoming City Manager, the posts remained primarily personal, and the posts that were City or COVID-19 related were information posted elsewhere and not used to post any original City-related information. Mr. Freed did not use any governmental resources and was the sole person to operate the account. The title of Mr. Freed's Facebook Page does not include any reference to his employment with the City. Mr. Freed's Page is not categorized as a Government Official but as a Public Figure, a designation that any Facebook user creating a Facebook page can choose.

Because Mr. Freed was acting as a private citizen on his Page, he was entitled to "exercise editorial discretion over the speech and speakers in the forum," which is exactly what he did when he blocked Plaintiff and others.[2] *See Halleck*, 139 S. Ct. at 1930. Mr. Freed's operation of his Facebook page does not involve any "right

---

[2] If Mr. Freed's Facebook page is considered an official government page, the page also constitutes government speech to which the First Amendment does not apply. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

or privilege created by the State," and, therefore, no state actions exists. *See Sullivan*, 526 U.S. at 50.

## II. IN THE ALTERNATIVE, PLAINTIFF'S FIRST AMENDMENT CLAIMS FAIL BECAUSE THE FACEBOOK PAGE IS NOT A <u>PUBLIC FORUM.</u>

Even if Defendant is considered to have been acting under the color of state law, the Facebook Page is not a public forum or a limited public forum. *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). At most, it is a nonpublic forum, which is government-owned property that is not traditionally or designated by the government as a forum for public communication. *Id.*

In deciding whether a space is a public forum, courts look at "the policy and practice of the government," as well as "the nature of the property and its compatibility with expressive activity" to determine the government's intent. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). "We will not find that a public forum has been created in the face of clear evidence of a contrary intent . . . nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Id.* at 803.

Traditional public forums include public parks, streets, and other places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). A designated public forum exists when the government opens a piece of government

property up to the public at large.  *Miller*, 622 F.3d at 534.  A limited public forum is one created by the government with uses limited to certain groups or certain subjects.  *Id.* at 535.

In *Knight First Amendment Inst.*, the Second Circuit held President Trump's Twitter account was a designated public forum because the account "was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the account as an official vehicle for governance and made its interactive features accessible to the public without limitation." 928 F.3d 226, 237 (2d Cir. 2019). President Trump's Twitter account was registered to "Donald J. Trump, 45th President of the United States of America, Washington, D.C." and was operated with the assistance of government employees, including the White House Social Media Director and Assistant to the President.  *Id.* at 235.  The parties stipulated in that case that the President's tweets are "official records that must be preserved under the Presidential Records Act."  *Id.* at 232.  President Trump also indisputably carried out his official duties on his Twitter account.  *Id.* at 231.

Mr. Freed's Facebook Page does not meet the definition of any type of public forum.  A Facebook page is not akin to a public park or street that is devoted to assembly and debate and, therefore, cannot be considered a traditional public forum. Mr. Freed's Facebook Page also cannot be considered to be a limited public forum because he never opened the Page to the public at large, especially in light of the fact

16

that he was the was the only person who was able to create posts on his Facebook Page.

Mr. Freed's Facebook Page also does not meet the definition of a designated public forum, and it is completely distinguishable from President Trump's Twitter account.  Mr. Freed was the only person who was able to post on his Facebook Page, and he never requested any feedback, response, or discussion from any other Facebook users.  Mr. Freed never used his Facebook Page for any official City business, never made official City announcements on the Facebook Page, and never expressly directed any posts to City residents.  Unlike President Trump's account that was managed by numerous government employees, no City resources, devices, or employees were ever used to operate his Facebook Page.

At best, Mr. Freed's Facebook Page is analogous to a judge's small reception area that was considered to be a nonpublic forum by the Sixth Circuit in *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007).  The Sixth Circuit held that the judge did not intend "to create a public' forum for expressive activity'" by maintaining an "open door policy" and making himself accessible to individuals seeking to discuss public matters with him.  Likewise, the fact that Facebook permits other Facebook users to post comments in response to original posts made by Mr. Freed does not demonstrate an intent by Mr. Freed to create a public forum for expressive activity.

Even if Mr. Freed's Facebook account were considered a limited public forum or a non-public forum, speech may permissibly be limited "based on subject matter

and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id*. (quoting *Cornelius*, 473 U.S. at 806); *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 102-03, 106-07 (2001).

In this case, Mr. Freed unequivocally testified that he blocked Plaintiff because of his past cyber activity and personal attacks. It is reasonable that a municipal employee would not want a poster who regularly disparages him to post on his Facebook Page where he posts picture of his wife and daughter. Accordingly, Mr. Freed's restriction of Plaintiff's speech was reasonable in light of the purpose served by his Facebook Page.

## III.   DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY ON THE DAMAGES CLAIMS.

To the extent Plaintiff claims that Mr. Freed acted as a governmental employee, Mr. Freed is entitled to qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an action violated a clearly established law, courts look at the objective reasonableness of the action in light of the legal rules that were clearly established at the time it was taken. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). "To be clearly established, a right must

be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In July 2019, the Sixth Circuit decided *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019). The plaintiff posted comments on an official police Facebook page that were deleted by two of the defendant officers. The Sixth Circuit held that the officers were entitled to qualified immunity given that the law regarding First Amendment protections for comments on social media platforms is far from clearly established:

> These claims fail because they are not based on clearly established law. The First Amendment no doubt applies to the wild and "vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735, 198 L. Ed. 2d 273 (2017). But when it comes to online speech, the law lags behind the times. And rightly so. "The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow." *Id.* at 1736; *see also id.* at 1744 (Alito, J., concurring in the judgment) (noting that courts should "proceed circumspectly, taking one step at a time" in applying "free speech precedents" to the Internet). Courts have not reached consensus on how First Amendment protections will apply to comments on social media platforms. So far, the courts that have considered the issue have taken different approaches. *See Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1012-13 (E.D. Ky. 2018) (denying preliminary injunction regarding the deletion of Facebook and Twitter comments in a case of first impression). *But see Davison v. Randall*, 912 F.3d 666, 687-88 (4th Cir. 2019) (holding that a government official violated the First Amendment by banning a critical constituent from a Facebook page). No doubt, any right Novak or the commenters may have to post or receive comments was not "beyond debate" at the time the officers

19

deleted the comments. *al—Kidd*, 563 U.S. at 741. Riley and Connor are entitled to qualified immunity from these claims.

*Id.* at 433-34; *see also Wagschal v. Skoufis*, 442 F. Supp. 3d 612, 624-27 (S.D.N.Y. 2020) (state senator entitled to qualified immunity because no clearly established law existed to give the senator notice that he could not block the plaintiff from his Facebook page); *Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 U.S. Dist. LEXIS 167247 (S.D. Cal. Sept. 26, 2019) (school board members entitled to qualified immunity when blocking plaintiffs from campaign Facebook pages)(attached as Ex. 8).

Likewise, Mr. Freed is entitled to qualified immunity. First Amendment law in the context of social media continues to be uncertain and far from clearly established. Even if it is assumed, *arguendo*, that Plaintiff had a right to keep his comments on Mr. Freed's page and not to be blocked by Mr. Freed, the right was not "beyond debate," and Mr. Freed is thus entitled to qualified immunity.

## IV.   PLAINTIFF'S OFFICIAL CAPACITY CLAIM AGAINST MR. FREED FAILS.

Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself; therefore, a successful suit against a municipal officer in his official capacity must meet the requirements for municipal liability stated in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Under *Monell*, a local government may not be sued under Section 1983 for an injury inflicted solely by its employees or agents. *Id.* at 694.

This holding specifically bars vicarious liability suits against municipalities. *Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000).  In fact, as the Supreme Court has noted in dictum, "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, . . . local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985).

To maintain a Section 1983 action against a municipality, a plaintiff must plead and prove the municipality itself caused the constitutional deprivation. *Monell*, 436 U.S. at 694.  A plaintiff must establish that his constitutional or federal rights were violated and that a policy or custom of the municipality was the moving force behind the deprivation of the plaintiff's rights.  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" and that "because the real party in interest in an official-capacity suit [against a municipal officer] is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law" (internal quotation marks and citations omitted)); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) ("[T]o satisfy the *Monell* requirements[,] a plaintiff must identify the policy, connect the policy to the city itself and show that the particular

21

injury was incurred because of the execution of that policy." (internal quotation marks omitted)).

Plaintiff cannot point to a policy or custom of the City of Port Huron that contributed to a violation of federal law or any type of a pattern because none exist. Mr. Freed was the sole operator of his Facebook page, and the City provided no support, monetary or otherwise, for the same. Therefore, Plaintiff cannot meet the *Monell* requirements, and the official capacity claims must be dismissed.

## V.   PLAINTIFF'S CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF FAIL.

Plaintiff cannot maintain his claims for injunctive and declaratory relief. First, such a claim may not be pursued against Mr. Freed in his individual capacity. *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) ("Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." (citing *Hafer*, 502 U.S. at 30); *Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587, 589 (7th Cir. 2005); *McGuire v. Strange*, 83 F. Supp. 3d 1231, 1242 n.8 (M.D. Ala. 2015) (claims for declaratory and injunctive relief cannot be asserted against municipal officials in their individual capacities).

As to the request for such relief based upon the official capacity claim, it is effectively a claim against the City Manager position itself, as the relief obtained in an officially capacity suit "is only nominally against the official and in fact is against

the official's office." *Lewis v. Clarke*, 137 S. Ct. 1285, 1292; __ U.S. __ (2017); *see also Gay v. Cabinet for Health & Family Servs. Dep't*, No. 18-5285, 2019 U.S. App. LEXIS 2336, at *18 (6th Cir. Jan. 23, 2019) ("We again note that the individual Defendants can be sued in their *individual* capacity for *money damages*, and additionally, the individual Defendants can be sued in their *official* capacity as to the *injunction* (because injunctions run against the office, not the individual.)")(attached as Ex. 9); *Miller v. Davis*, No. 15-5880, 2015 U.S. App. LEXIS 23060, at *3 (6th Cir. Aug. 26, 2015) ("The injunction operates not against Davis personally, but against the holder of her office of Rowan County Clerk.")(attached as Ex. 10). Accordingly, when "officials sued in their official capacities leave office, their successors automatically assume their role in the litigation." *Lewis*, 137 S. Ct. at 1292.

Here, there is no occasion to issue an injunction or declaratory relief against the City Manager's position because no "official" City Manager Facebook Page exists. Mr. Freed's Facebook Page is a personal page of which he is the sole administrator. No City employees participate in the operations of his Facebook page, and no City devices are used to operate the Page. Whereas a court may have the occasion to issue injunctive and declaratory relief against an "official" municipal Facebook page, like the Port Huron Police Department page, there is simply no opportunity to award such relief here where no City Manager Facebook page exists.

Finally, injunctive and declaratory relief are inappropriate because the issue is now moot given that Mr. Freed no longer operates his Facebook page, which has been shut down or inactive for most of the past year.  Article III of the United States Constitution limits the power of federal courts to "[c]ases" and "[c]ontroversies." U.S. Cons. Art. III, § 2.  A federal court "lacks jurisdiction to consider any case or issue that has lost its character as a present, live controversy and thereby becomes moot." *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009); *see also Green v. Mansour*, 474 U.S. 64, 68 (1985) (to maintain an official capacity claim for injunctive and declaratory relief cognizable under 42 U.S.C. § 1983, plaintiff must plead and be able to prove a continuing violation of his First Amendment rights); *Small v. Brock*, 963 F.3d 539, 543 n.2 (6th Cir. 2020) (holding that, in the absence of a real and immediate threat that the action will occur in the future, a plaintiff is not entitled to declaratory relief).

Voluntary cessation moots a case where "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003) (citation omitted).  Government defendants who make representations that certain conduct has been discontinued are entitled to deference, and a court will not revive a moot case by speculating about the defendant's future action. *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003); *see, e.g.*, *Jones v. Goord*, 435 F. Supp. 2d 221, 256 n.36 (S.D.N.Y. 2006) (refusing to "project" that plaintiff might someday be subject

to same unlawful conduct that defendants had voluntarily ceased); *Bandler v. Town of Woodstock*, No. 2:18-CV-00128, 2019 U.S. Dist. LEXIS 188820, 2019 WL 5616956, at *8 (D. Vt. Oct. 31, 2019) (plaintiff's claim that unlawful conduct might recur was based on "conjecture" and "too speculative for Article III purposes")(attached as Ex. 11).

The Southern District of New York found that a plaintiff's claims were moot in a case involving a state senator who blocked and muted a Facebook user in *Wagschal*, 442. F. Supp. 3d at 621-23.  The Court held that the plaintiff's claims were moot because senator "terminated the conduct giving rise to this case long before filing the present motion."  *Id.* at 622.

Assuming *arguendo* that Mr. Freed's actions taken on his Facebook Page were a violation of federal law, which Mr. Freed maintains they were not, Plaintiff's claims are moot because Mr. Freed terminated the conduct giving rise to this case long before filing the instant motion.  Mr. Freed's Facebook page has been unused for nearly a year.  Mr. Freed unequivocally testified that he has not published his Facebook page and will not again if he cannot maintain his Facebook page as a personal page.  Thus, Plaintiff's claims are moot.

## <u>CONCLUSION</u>

Based upon the foregoing arguments and authorities, Defendant requests that this case be dismissed pursuant to Fed. R. Civ. P. 56.

FLETCHER FEALKO

SHOUDY & FRANCIS, P.C.

By:  /s/ Todd J. Shoudy (P41895)

Fletcher Fealko Shoudy & Francis, P.C.

Attorney for Defendants St. Clair County,

Deps. Silver, Pink, Goodrich & Sgt. Stringer

1411 Third Street, Suite F, Port Huron,

Michigan  48060,  (810) 987-8444

DATED:  February 17, 2021          tshoudy@fletcherfealko.com


The undersigned certifies that a copy of the foregoing instrument was served upon attorney for Plaintiff on February 17, 2021, by electronic filing.

/s/ Denise D. McClure
Denise D. McClure
Fletcher Fealko Shoudy & Francis, P.C.
1411 Third Street, Suite F
Port Huron, Michigan 48060
(810) 987-8444
dmcclure@fletcherfealko.com