1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF MICHIGAN

 3                      SOUTHERN DIVISION

 4

 5   KEVIN LINDKE,

 6            Plaintiff,

 7    vs.                        Case No. 2:20-CV-10872

 8                               Hon. Mark A. Goldsmith

 9   JAMES FREED,                Magistrate Judge:

10            Defendant.         Hon. David R. Grand

11   _____

12

13

14      The Deposition of JAMES FREED,

15      Taken Via Zoom,

16      Commencing at 12:23 p.m.,

17      Tuesday, December 29, 2020,

18      Before Valerie Jo Lohr, CSR-6212.

19

20

21

22

23

24

25

FREED, JAMES
12/29/2020                                                                    Page 2

```
 1   APPEARANCES:

 2

 3   PHILIP L. ELLISON (Via Zoom)

 4   Outside Legal Counsel PLC

 5   PO Box 107

 6   Hemlock, Michigan 48626

 7   (989) 642-0055

 8   pellison@olcplc.com

 9       Appearing on behalf of the Plaintiff.

10

11   TODD J. SHOUDY (Via Zoom)

12   Fletcher, Fealko, Shoudy & Francis, PC

13   1411 Third Street

14   Suite F

15   Port Huron, Michigan 48060

16   (810) 987-8444

17   tshoudy@fletcherfealko.com

18       Appearing on behalf of the Defendant.

19

20

21

22

23

24

25
```

```
 1                        TABLE  OF  CONTENTS

 2

 3     WITNESS                                          PAGE

 4     JAMES  FREED

 5

 6     EXAMINATION

 7     BY  MR.  ELLISON:                                  4

 8

 9

10

11                          EXHIBITS

12

13     EXHIBIT                                          PAGE

14     (Exhibits  not  offered.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    Via Zoom,

 2    Tuesday, December 29, 2020

 3    12:23 p.m.

 4

 5                        JAMES FREED,

 6         was thereupon called as a witness herein, and

 7         after having first been duly sworn to testify

 8         to the truth, the whole truth and nothing but

 9         the truth, testified as follows:

10                        EXAMINATION

11    BY MR. ELLISON:

12    Q.   James or Jim or Mr. Freed, which would you prefer this

13         morning?  I'm sorry, you cracked there.

14    A.   James is fine.

15    Q.   James, good morning.  I'm attorney Philip Ellison.  I

16         represent Kevin Lindke in this lawsuit that you've been

17         called here to testify to in your deposition.

18              Before I start here, just to lay some ground

19         rules, I'd just ask -- first of all, have you ever done

20         a deposition?  It sounds like you have before.

21    A.   I did once the first time over a fire we had in town

22         like, I don't know, what, a year or so ago.  That was

23         my first one.  So this is my second one.

24    Q.   Then consider yourself a lucky man that you've gotten

25         this far in life without being deposed.
```

```
 1                        I'm just going to ask you a couple of
 2          questions today.  Unlike most attorneys, I'm not a big
 3          fan of depositions.  I try to make them as quick and as
 4          painless as possible.  I'm just going to ask you some
 5          questions, you just give me the answers back.  When I
 6          get all done, Mr. Shoudy might have some questions for
 7          you as well.  Occasionally one of us may object to the
 8          other one's question.  We just let that get the
 9          objection out.  You still answer the question even
10          though there's an objection, and then the lawyers fight
11          later on whether or not the question was improper in
12          any way, shape or form.  The only time you would not
13          answer a question would be is if Mr. Shoudy directs you
14          not to answer the question, and we'd get to fight about
15          that later.  But I doubt in this case we're going to
16          have any such thing going forward.
17                        The only other question I have, are you in a
18          position today to be able to do a deposition?  You
19          don't have any health concerns, physical or mental or
20          emotional, that you can do the deposition freely and
21          clearly today?
22     A.   Correct.
23     Q.   All right.  Occasionally I may say just because today
24          we've been having -- I've had computer problems, Todd's
25          had computer problems, and still every once in a while
```

```
 1        you'll chop up.  If I say is that a yes or repeating,

 2        I'm not trying to be rude.  It's just we sometimes have

 3        to do that when people say uh-huh and ums and other

 4        times, because Zoom is just not as flawless as we'd

 5        like it to be yet.  So it's not me trying to be rude.

 6        We've just got to make sure the record is clear for Val

 7        there.

 8                 MR. ELLISON:  And, Val, as Mr. Freed

 9        indicated, I also talk fast.  If the court reporter

10        needs us to repeat, we work for her, to make sure the

11        record's clear.

12   BY MR. ELLISON:

13   Q.   All right.  So you are James Freed, the Defendant in

14        this case?

15   A.   Yes.

16   Q.   All right.  And just to shortcut it, you are the city

17        manager for the City of Port Huron, correct?

18   A.   I am.

19   Q.   All right.  And you had a Facebook page that had the

20        user name associated with James R. Freed1, correct?

21   A.   Yes.

22   Q.   All right.  Do you know what the difference is from a

23        standpoint of a user of a Facebook page versus a

24        Facebook profile?

25   A.   Yes.
```

```
 1   Q.   Okay.  Understanding you don't work for Facebook, can

 2        you in your own words as a user explain what you

 3        understand the difference between a Facebook page

 4        versus a Facebook profile is?

 5   A.   So a Facebook profile is relatively similar in that a

 6        Facebook profile has limitations on how many friends

 7        you can have, things like that.

 8   Q.   Okay.  So as I understand Facebook profiles, you can

 9        share articles, post comments, post information, or how

10        you're feeling, what you're doing, what you're eating.

11        Things like that can be on a Facebook profile but can

12        also equally be posted by the person who owns a

13        Facebook page to be able to do the same functions,

14        correct?

15   A.   Correct.

16   Q.   And as I understand it as well, you can confirm you

17        have a Facebook page associated with James R. Freed1 as

18        opposed to a Facebook profile?

19   A.   Not quite accurate.

20   Q.   Okay.  Explain that to me then.

21   A.   I can give you some history.  So I've had a Facebook

22        account since college.  I graduated college in 2008.

23        And so before that, before college, I worked in the

24        private sector, and so I had around -- I had over 4,000

25        friends, kneeling on 5,000 friends.  Facebook only
```

1    allows you to have 5,000 friends.  So somewhere between

2    2011 and 2013, I'd have to Google it to find out the

3    date, when Facebook first came out, a lot of folks

4    didn't realize it was a 5,000 friend limit.  So like a

5    business would create a business account and people

6    would add the business as a friend, well, then they

7    would max out at 5,000 people.  Or people who had a

8    Facebook account, you know, like photographers or

9    something where a lot of people wanted to follow, they

10   would max out at 5,000.

11          So, you know, somewhere between '11 and '13,

12   I don't know the exact date, I probably can get the

13   year if I Googled it, Facebook allowed for a one time

14   conversion from a Facebook account profile to a page.

15   So one time -- you couldn't go back.  You could convert

16   your Facebook account to a Facebook page.

17   Q.   Okay.

18   A.   So that's what I did.  So I took my account that I've

19   had since college and I convert -- because I was going

20   to cap out at 5,000 people, and I converted it to a

21   Facebook page so that more people could follow and I

22   could engage with more friends and family on there.

23          So it was a Facebook private account that

24   Facebook allowed to convert to a page since there's so

25   many friends.

```
 1   Q.   Okay.  And were there any requirements for you to show

 2        that you had some sort of special status to warrant

 3        authorization from a Facebook account as you called it

 4        into a Facebook page?  Meaning you had to be a

 5        business, you had to be a public figure, you had to

 6        be --

 7   A.   No, not that I remember.  Anyone could do it.

 8   Q.   All right.

 9   A.   You could really just click it and it was done.

10   Q.   Okay.  Since that time, when did you first become city

11        manager for the City of Port Huron?

12   A.   In 2014.  I think my first day was June 2nd, somewhere

13        around there.

14   Q.   And as part of that process, did you continue to use --

15        after you became the city manager, and obviously you

16        know the answer but bear with me, as you became city

17        manager, you continued to use your James Freed Facebook

18        page, correct?

19   A.   Correct.  Yes.

20   Q.   And that's that James R. Freed1 user name designation,

21        true?

22   A.   Yes.

23   Q.   Let me see if I can share a page.  Hold on one second.

24        All right.  Here we go.  This is what I'm looking for

25        right here.  And for purposes of identification, this
```

1          is page 8 of the complaint, which is part of Paragraph

2          28 of the complaint itself.

3                    James, can you see that screen shot on your

4          screen right now?

5     A.   Yes, sir, I can.

6     Q.   Okay.  Understanding there are multiple posts obviously

7          in the Facebook page, would this be generally speaking

8          one type of post made to your Facebook page?

9     A.   Yeah.

10    Q.   Okay.  So my question I want to understand is, as part

11         of your operation of this Facebook page, we see posts

12         like this one.

13    A.   Yes.

14    Q.   Which looks to me to be an announcement of city

15         activities.  Would you agree with that?

16    A.   Yes.  But this is not where we would announce them

17         first.

18    Q.   Okay.

19    A.   If nothing was ever announced on my Facebook that

20         wasn't readily available, either city press releases,

21         newspaper articles, other information sources, I didn't

22         make announcements like first time you hear it here on

23         my Facebook page.

24    Q.   Fair enough.

25    A.   I would take information from other parts of the

1       community, sources and stuff and put it out there.  But

2       I get what you're saying.

3   Q.  Right.  So I guess what I'm trying to understand would

4       be is that it was part of the operation of this

5       Facebook page that even though it wasn't necessarily

6       the initial broadcast of a particular activity, it

7       would be a way that you as city manager would

8       reverberate that message out to get it to as many

9       people in the community as possible?  Is that a fair

10      assessment?

11  A.  Yes.

12  Q.  Okay.  As part of that, again, using this one as an

13      example -- and, again, understanding there are others,

14      but looking at this one as an example, right below

15      right there, and I'll just make the representation,

16      this is a screen shot I made of this page back when I

17      made the lawsuit, because you can kind of see the

18      picture of my family right there where it says write a

19      comment right below the post.

20  A.  Yeah.

21  Q.  That's me right there.  Below this there's a spot on

22      there to write comments in response to your posts,

23      correct?

24  A.  I'm not sure if it's to invite comments.  I wasn't able

25      to turn that feature off.

```
 1   Q.   Okay.

 2   A.   Meaning --

 3   Q.   To your knowledge -- I'm sorry.  Go ahead.

 4   A.   Meaning like other features like messaging where people

 5        can't contact me, because I don't want to be messaged.

 6        But I cannot turn off the comment feature.  So it's not

 7        like a choice that you can -- it allows you to comment.

 8        I just -- I would take issue with the word invitation,

 9        because I didn't -- I would have turned that off.  But,

10        yes --

11   Q.   Fair enough.  Go ahead.

12   A.   Yes to your question.  I get what you're asking.  Can

13        people comment on my posts?  Yes.

14   Q.   Okay.  Let me rephrase that then in terms of to avoid

15        the word invite.  There would be the availability to

16        comment in response to a post that was made by you

17        about city activities such as this one about putting

18        the fishing docks open early to help with the social

19        distancing obligations that the state had put into

20        place due to COVID, for example, fair?

21   A.   This was more a joke about fishing and social

22        distancing.  I was making a joke.  But, I mean, yeah,

23        your assumption is correct, yes.

24   Q.   All right.  Did you have any prior criteria or standard

25        that you developed in written form or customary form or
```

```
 1        on some basis that dictated what types of posts you

 2        would put onto this particular Facebook page?

 3   A.   No, not at all.  I've shared every -- the majority are

 4        family photos, pictures of my dog, dinner, I've shared

 5        bible verses that I found interesting, I've shared

 6        YouTube videos that I found interesting or inspiring.

 7        I mean, no, it's pretty much just whatever I found

 8        interesting.  I've been doing that since college.

 9   Q.   Okay.

10   A.   I treated it as anyone would their own personal

11        Facebook, things that interested them, things that --

12        you know.

13   Q.   Now, for example, below this particular one about the

14        Facebook posts there, someone has responded to you by

15        the name of Jenny Lynn.  Do you know this Jenny Lynn?

16        Is this a friend that you know of?

17   A.   I recognize the name just because she posts a lot.  I

18        don't recall ever meeting her.

19   Q.   Okay.  So fair to say this is a -- we use the word

20        friends, obviously, in the Facebook world to mean

21        something different than the traditional phrase of

22        friends.  Would you agree with that?

23   A.   Yes.

24   Q.   Okay.  A friend on Facebook is not necessarily what we

25        would constitute as a personal friend, it's just a
```

```
 1        connection has been made, an authorized connection

 2        between two users on Facebook would be a Facebook

 3        friend, is that fair?

 4   A.   Well, I don't know.  Because some people who share my

 5        stuff and comment don't follow my page and are a Like

 6        on my page.

 7   Q.   Okay.  Fair enough.

 8   A.   A page for the public, it can be anybody.

 9   Q.   Okay.  So looking at this one, just an example one,

10        this Jenny Lynn asked a question about when the City

11        would be picking up lawn and leaf bags soon, and you

12        responded -- the answer is yes?

13   A.   Yes.

14   Q.   So to be fair, you were answering questions that were

15        posed that were unrelated to the post about city

16        questions at the time?

17   A.   Yeah.  Like I would with anyone, if a neighbor asked me

18        or something like that.  I knew the answer so, yes, I

19        responded back.

20   Q.   Now, as part of this lawsuit, the allegations that have

21        been made by Mr. Lindke through my office is that you

22        in the operation of this page have deleted Facebook

23        comments made by certain individuals onto this

24        particular page.  And we've heard some testimony --

25   A.   I've read --
```

```
 1   Q.   I'm sorry?

 2   A.   I've read the complaint, and I don't dispute any of it.

 3   Q.   Okay.

 4   A.   To be honest -- I don't dispute any of the allegations

 5        in the complaint.  This is my personal Facebook page.

 6        There was no rhyme or reason on how I -- if I didn't

 7        like a comment or if I thought it was creepy -- there's

 8        been some creepy people over the years who have made

 9        inappropriate comments about my wife and my kids or

10        liked pictures.  I get what you're alleging, and I

11        don't dispute any of it.  I treat it as my personal

12        Facebook page.  I have since college.  I only converted

13        to a page because I couldn't have more than 5,000

14        friends.  I've operated this page under the assumption

15        that's my page.  I've had it through multiple jobs

16        before I became city manager of Port Huron.  I've never

17        accessed this page on any city device or machine.  So I

18        get the question you're asking.  You know, was this my

19        personal work -- and I think it's a fair question.  I

20        was treating this as a personal Facebook post.  So I

21        don't -- I don't -- I've read your report and your

22        allegations that I deleted comments, that I blocked

23        people.  I don't dispute that in any way.

24   Q.   Okay.  Well, let me make sure to get the record clear,

25        because this is my opportunity to talk to you on this.
```

1               We've heard some testimony from different

2       folks who have said that comments they have posted that

3       have criticized either the mayor or your response to

4       deleting other people's posts or about the city's

5       response to COVID have been deleted by you in the

6       operation of this particular page.  You don't dispute

7       that?

8               MR. SHOUDY:  For the record -- just one

9       second, James.  Just for the record, Mr. Freed wasn't

10      present at the earlier depositions and we don't have a

11      transcript yet, so your question is, you know, has he

12      heard the testimony, the answer is he hasn't.  But if

13      your question is has he deleted posts, I think he can

14      answer that.

15              MR. ELLISON:  I was going to the latter

16      question.  I wasn't asking him -- obviously there's no

17      transcript yet on this and he wasn't there.

18              THE WITNESS:  Yes.  Yes to your question.

19  BY MR. ELLISON:

20  Q.  Okay.  And so at any time have you banned any

21      particular users of Facebook from being able to comment

22      on your Facebook page?

23  A.  Very rare.  During the time -- if I blocked your

24      client, I didn't do so in comments that he -- I didn't

25      block him based on his comments.  Because I really

```
 1        don't recall anything he specifically wrote.  I just

 2        remember one time he wrote like three weird smiley

 3        faces, and that was like the first time I saw him on my

 4        page.  And to be quite honest, I was really creeped

 5        out, because I had been aware of other things in this

 6        community where he had essentially stalked people,

 7        harassed people, lots of PPOs and records.  So when I

 8        block your client, I blocked him not on what he --

 9        because I can't really recall anything he posted.  I

10        blocked him specifically on who he was.  And I know

11        what he's done in the community to some school

12        employees and other stuff, so I blocked him just on who

13        he was.  I can't recall besides the three smiley faces

14        anything that he specifically wrote.  I mean, I'm not

15        disputing that he did.  I may have deleted it.  I just

16        can't recall it.  Because I've tried to ponder it.

17                And then in the few days after, I blocked

18        several accounts that I suspected could be him, because

19        I was made aware that he had numerous fake accounts.

20        So I blocked a bunch of people I thought could be him.

21        Some probably weren't.  I don't dispute that.

22   Q.   All right.  Fair enough.

23                You can imagine the difficulty from my aspect

24        of this case trying to find -- trying to establish that

25        there were comments that were deleted.  And of course
```

```
 1        as part of discovery, I asked you to produce the
 2        downloadable aspect of it.  And, of course, those
 3        aren't -- you guys didn't -- they're not there.
 4        They're not there anymore.
 5   A.   No.  I think you and I can come to an agreement that I
 6        deleted comments I didn't like.
 7   Q.   Okay.
 8   A.   I deleted comments that were -- I felt -- some were
 9        just like derogatory towards me.  Sometimes someone
10        would write something stupid and I just didn't care.
11        If anything was -- over the years if people posted
12        about me or my family specifically or anything that's
13        weird, I mean, I can't recall anything, but I did so
14        under the premise that this was a private page.  And if
15        I can be somewhat candid with you, I mean, I hate
16        getting sued.  It's not fun.  But it's an interesting
17        -- from a scholarly aspect, you're asking an
18        interesting question.  You know, I get what you're
19        going for.  Was my page at some point public.  I was
20        under the presumption that it was personal.
21             There was never any city involvement in my
22        page.  I never used a city machine, a city device,
23        anything to access the page.  And so it's like I always
24        thought it was personal.  If it wasn't -- to be quite
25        frank, if I couldn't use it as a personal page, I
```

```
 1          wouldn't have had one.  You know, I don't want an
 2          official city manager page.
 3    Q.    Well, let me ask you this:  Looking at what's on your
 4          screen right now, this was posted on March 26 at 9:05
 5          in the morning.  I mean, that would be the normal time
 6          you'd be working as the city manager for the City of
 7          Port Huron, correct?
 8    A.    It depends.  I mean, I'm salary exempt, so I'm on call
 9          24/7.  I don't know what day that was.  I don't know if
10          I was at a meeting late that night and decided to come
11          in later.  So based on my time, sometimes I come in at
12          7:00 in the morning, sometimes 10:00 in the morning
13          based on my schedule.  So I'm essentially salary
14          exempt.  But I'd have to go back and look at my
15          calendar and find out where I was.  I get what you're
16          saying, normal business hours.  I don't -- I don't
17          dispute that.
18    Q.    All right.  Well, let me switch to this one right quick
19          here.
20    A.    I guess where I keep going with this, Phil, I think you
21          and I agree on a lot here.  The question is was this my
22          personal page or not.  I don't dispute much of what
23          you're asking me.
24    Q.    And I appreciate that.  I mean, that's one of the --
25          and I will acknowledge, I'm surprised your attorney
```

| | | |
|---|---|---|
| 1 | | didn't have a stroke right there when you said I'm not |
| 2 | | disputing anything in your lawsuit.  You're obviously |
| 3 | | not disputing any of the facts about deleting comments |
| 4 | | and stuff.  Whether or not it's a First Amendment |
| 5 | | violation is something for the lawyers and the courts |
| 6 | | to sort out.  Fair? |
| 7 | A. | Yes.  And I respect the scholarly question of -- you |
| 8 | | know, you're asking a scholarly question.  At some |
| 9 | | point, am I no longer personal.  You know, I mean, I |
| 10 | | don't know. |
| 11 | Q. | Well, let me ask this question.  This is a weird |
| 12 | | question and bear with me.  But were you ever aware at |
| 13 | | any point about the litigation where Donald Trump as |
| 14 | | president had a Twitter account that was private before |
| 15 | | he became president and that the Second Circuit |
| 16 | | ultimately concluded that it became public because of |
| 17 | | his role and his activities of becoming a public |
| 18 | | official?  And, again, that's my recitation -- |
| 19 | A. | No. |
| 20 | Q. | -- of the details of that.  But were you aware of that |
| 21 | | case at all? |
| 22 | | MR. SHOUDY:  I'm just going place -- |
| 23 | | THE WITNESS:  I am -- |
| 24 | | MR. SHOUDY:  Wait one second, James. |
| 25 | | I'm just going to place an objection to the |

1       form and foundation of the question, because I think

2       there are other factors in there.  Obviously, you're

3       not reciting the whole case, but I appreciate that.  So

4       try to answer it if you can.

5   BY MR. ELLISON:

6   Q.  And that's fair enough.  James, I want to be clear, I

7       guess.  Are you an attorney?  I didn't think you were.

8   A.  No.

9   Q.  Okay.  Well, then you have a better life than the rest

10      of us then, right?  I mean, to be clear, I'm not trying

11      to ask you if you have a legal opinion.  But from your

12      standpoint as a city manager, were you aware of the

13      President Trump case involving his Twitter account at

14      all?

15  A.  At the time, no.  But you have afforded me an education

16      in these months, so I've learn about some other things.

17      I've also heard about other cases.  But, no.

18  Q.  Okay.

19  A.  No.  At the time, no.  But as of now I've got a little

20      education.

21  Q.  All right.  Well, very good.  So looking at Exhibit A

22      to the complaint that's been filed, this is the about

23      section of that Facebook page, okay?

24  A.  Yes.

25  Q.  And I'm looking at this.  This is, I guess, what I want

```
 1           to give you some pushback on, your assertion that this
 2           was a private page.  Because looking at the page, you
 3           have hours of -- there's an hours function, and it says
 4           always open.  Now, let's just assume between the two of
 5           us right now that that's a default setting and that you
 6           didn't select that, okay?
 7    A.     Okay.
 8    Q.     I'm looking at the contact information section, what I
 9           have in front of you right now.  And the e-mail address
10           that's associated with this account is
11           communitycomments@porthuron.org.  You testified earlier
12           that you did not become the city manager until 2014 and
13           this conversion from a personal account to a Facebook
14           page occurred in 2014.  How do we --
15    A.     No.  No.  No.  The conversion page and account was well
16           before I ever came to the City of Port Huron.
17    Q.     Okay.
18    A.     It was done sometime between 2011 and 2013, I believe.
19    Q.     Okay.
20    A.     It could have been 2010.  I'd have to go back and see.
21           It was a page well before I became the city manager of
22           Port Huron.
23    Q.     Fair enough.
24    A.     And after I became the city manager of Port Huron, the
25           information I put on there was just mere convenience.
```

```
 1          I just copied and pasted my bio.  I don't have a
 2          website, so I just put the city website.  I wasn't
 3          thinking at the time the reasoning why.  I don't have a
 4          website, so I put a website.  The e-mail was created I
 5          think after I got here that we used for just general
 6          inquiry.  I just threw that out there.  Because people
 7          do ask how to get ahold of you.  But in hindsight, I
 8          wouldn't have put it on there.
 9   Q.     Okay.  But from a public perspective looking at a
10          Facebook page trying to find the city manager and they
11          look at the about page here, I mean, we've got where
12          there's an official City of Port Huron e-mail address,
13          a link to the City of Port Huron website, and if we
14          scroll down a little bit further, it also identifies
15          you right here as a public figure as well.
16   A.     Well, I do remember when I had to -- when you had to
17          pick like are you a business, are you a person, they
18          gave me the option between public figure and public
19          official.  And I'm not a public official, because I
20          don't hold office.  With a public official you have to
21          put your office you hold, what government you work for,
22          all that.  And I never -- I chose -- I purposely chose
23          not the public official.  So the other one is a public
24          figure which they classify anybody who is well-known in
25          the area.  Celebrities do that.  You know,
```

```
 1        photographers do that.  So that's why I picked public

 2        figure and not public official.  Because public

 3        official was an option, what position you hold, what

 4        government and all that.  So I didn't do that.  Public

 5        figure was like the last one left.

 6   Q.   All right.

 7   A.   I wish I had a better answer.

 8   Q.   No.  No.  No.  I mean, that's fair enough.  And I do

 9        appreciate you acknowledging the scholarly question on

10        this, because it does present I think a unique

11        (inaudible).  That's my viewpoint it does at least.

12   A.   Yes.

13   Q.   It certainly makes Mr. Shoudy and I have a fun time in

14        court trying to spar about legal issues.  But I guess

15        with you acknowledging about deleting, you know,

16        comments and users and your perspective why, that

17        answers the majority of my questions today.

18   A.   Yes.  The question --

19   Q.   Go ahead.

20               MR. SHOUDY:  Hey, James, wait for a question.

21               THE WITNESS:  Okay.

22               MR. SHOUDY:  Wait for a question.  I know

23        you're getting ahead of him a little bit and it's

24        helping this thing go quicker, but let's just wait for

25        a question, okay?
```

```
 1                    THE WITNESS:  Okay.  Sorry about that.

 2   BY MR. ELLISON:

 3   Q.   That's all right.  As you can see, I don't take a very

 4        hard mean lawyer approach.  I take a more friendly

 5        folksy approach with my litigation, and sometimes that

 6        gets both of us in trouble.

 7                    But anyway, two other questions I have with

 8        this is, one is that currently I've gone online to try

 9        to locate this page again, and I can't find it on

10        Facebook anymore.  What's happened to it?

11   A.   So my -- so it is not uncommon that throughout the

12        entire time I've had the page I will un-publish it for

13        days, weeks or months.  Like, sometimes you'll say I'm

14        done with social media.  I take a break from social

15        medial all together.  However, I think it was March or

16        April, Facebook disabled my account.  No explanation

17        why, no communication, nothing.  I essentially went

18        through their process where I had to actually scan a

19        photo of my driver's license and send it to Facebook.

20        They reactivated it.  So it was available for -- it was

21        somewhere like in June I got back activated.  But

22        quickly thereafter, it was disabled again without any

23        reasoning.  I can assume that a bunch of people with

24        accounts had to go report -- from my own Google, from

25        researching, if a bunch of people report you, they'll
```

```
 1         disable your account and they make you go through the
 2         process.  I have no idea.  It was disabled for months.
 3         I mean, I didn't have access to it.  I couldn't even
 4         log in all the way up until I think it was sometime in
 5         October I tried to log in and it let me in.  The page
 6         is un-published because -- I think you asked the
 7         question is this a public page or private.  I assumed
 8         it was a private page.  If it is not going to be a
 9         private page, I don't want it.  I don't want to have --
10         I wouldn't put photos of my family out there.  I
11         wouldn't put photos of my kid out there if I didn't
12         have the ability to control it like a personal page.
13         So it is un-published.  Nobody can find it.
14    Q.   Okay.  Just to be clear, you do have access and control
15         over that account currently?  For example, if the judge
16         wanted to view this page, you would have the ability to
17         I think the word you used is publish it, basically
18         reactivate it publically and it could be seen again at
19         your direction and command, correct?
20    A.   I believe so.  But do note that whatever does get
21         published and -- you know, I don't know what's going
22         on.
23    Q.   Okay.  You can't --
24    A.   I think --
25    Q.   Go ahead.
```

```
 1   A.   I would never have a page like this -- I don't want a

 2        -- you know what I mean?  Like, I was under the

 3        presumption it was a personal page.  So until that

 4        question is answered, it's un-published.  But yes to

 5        your question.

 6   Q.   Okay.  Fair enough.  And do you happen to know -- and

 7        I'm going to use the word friends, Facebook friends or

 8        Facebook connections you have associated with this

 9        particular Facebook page.

10   A.   I think there's north of like 5,500 people who like it.

11        And then I think -- I don't know how Facebook --

12        there's a difference between likes and followers, and I

13        don't know if they overlap.  There's also a follow

14        component to it, and I think that's a couple thousand.

15        But I don't know -- if a like is considered a follow, I

16        don't know if it's the same thing.

17   Q.   Okay.  And these people that you've identified, these,

18        you know, whatever number of thousands of people, are

19        these people all that you know, or are these people

20        that have --

21   A.   The vast -- the overwhelming vast majority are people I

22        know, people I've worked with, family and friends.  I

23        speak a lot across the country.  I've spoken to a civic

24        group or I've spoken to an association and follow me, I

25        mean, so yeah.  Well beyond the scopes of the City of
```

```
 1        Port Huron.

 2   Q.   Do you know of the number of followers or for lack of a

 3        better work likers who are following you who are simply

 4        constituents of the City of Port Huron?

 5   A.   No.  No idea.

 6   Q.   All right.  Based on your experience operating this

 7        Facebook page, would you acknowledge that there are

 8        constituents and members of the public that are in fact

 9        interacting with your Facebook page until it was shut

10        down, obviously?

11   A.   Yes.  And you know, I've been stopped at the grocery

12        store and people are like, I love seeing the pictures

13        of your family and your kids.  I mean, it was almost

14        like they were my -- I couldn't have a Facebook account

15        for friends because I had too many.  That's the only

16        reason why it's a page and not an account.

17   Q.   All right.  Okay.

18   A.   Yes to your question.

19   Q.   You've done a nice job, and I appreciate it.  The one

20        last set of questions I have is, and this is a bit

21        weird in terms of the question I have to ask in terms

22        of the format, but before you banned any particular

23        user from commenting or being able to post statements

24        onto your Facebook page in whatever fashion and status

25        it was, did you ever give anybody the opportunity to --
```

```
 1        give them notice and the opportunity to say you

 2        shouldn't do that?

 3   A.   No.  I had -- I had no standards or methodology.  I

 4        didn't -- no.  No.

 5   Q.   Let me ask it this way, and if you don't know, it's

 6        perfectly all right to say you don't know.  But as a

 7        public official, are you aware that there's an

 8        obligation under the US Constitution for certain types

 9        of things that need to have what are called procedural

10        due process?  Is that something you're familiar with?

11   A.   Yes, I am.  But, again, I believed the page was under

12        my personal account.  But, yes.

13   Q.   Fair enough.  Fair enough.  And I understand that, and

14        I get it.  But my question I want to ask just to

15        establish for the record here is did you provide any

16        procedural pre-deprivation or post-deprivation notice

17        and the opportunity to be heard to any user before they

18        were suspended or banned from being able to comment on

19        this Facebook page?

20   A.   No.

21   Q.   Okay.  Same question but as to comments that have been

22        placed.  Did you give any pre- or post-deprivation

23        notice to the commenter that the comment was going to

24        be deleted or was deleted and could possibly be

25        restored and gave them the chance to have an
```

```
 1        opportunity to be heard, to make an argument to you

 2        before you did that?

 3   A.   No.

 4   Q.   All right.  And that's why I said it's a bit awkward of

 5        a question, because it's got a lot of legalese tied up

 6        with it as well.

 7               MR. ELLISON:  Other than that, I have no

 8        further questions for you.  I know you were on

 9        vacation.  I appreciate you coming in during your

10        vacation to speak with me.  I promised Todd this

11        wouldn't last more than an hour, and I think I kept my

12        word here today.  So I have no further questions.  Todd

13        might have a couple questions for you.  And if he does,

14        I may have a couple of follow-ups.  But other than

15        that, that takes care of my time I needed with you

16        today, and I appreciate it.

17               MR. SHOUDY:  All right.  Well, thank you.  I

18        have no questions.

19               (The deposition was concluded at 12:58 p.m.

20               Signature of the witness was not requested by

21               counsel for the respective parties hereto.)

22

23

24

25
```

```
 1                      CERTIFICATE OF NOTARY

 2   STATE OF MICHIGAN   )

 3                       ) SS

 4   COUNTY OF ST. CLAIR )

 5

 6         I, Valerie Jo Lohr, C.S.R., certify that this

 7       deposition was taken before me on the date hereinbefore

 8       set forth; that the foregoing questions and answers

 9       were recorded by me stenographically and reduced to

10       computer transcription; that this is a true, full and

11       correct transcript of my stenographic notes so taken;

12       and that I am not related to, nor of counsel to, either

13       party nor interested in the event of this cause.

14

15

16

17

18

19

20

21

22               VALERIE JO LOHR, CSR-6212

23               Notary Public,

24               St. Clair County, Michigan

25               My commission expires:  May 23, 2027
```

FREED, JAMES
12/29/2020

Index: 10:00..clear

**1**

**10:00** 19:12
**11** 8:11
**12:23** 4:3
**12:58** 30:19
**13** 8:11

**2**

**2008** 7:22
**2010** 22:20
**2011** 8:2 22:18
**2013** 8:2 22:18
**2014** 9:12 22:12, 14
**2020** 4:2
**24/7** 19:9
**26** 19:4
**28** 10:2
**29** 4:2
**2nd** 9:12

**4**

**4,000** 7:24

**5**

**5,000** 7:25 8:1,4, 7,10,20 15:13
**5,500** 27:10

**7**

**7:00** 19:12

**8**

**8** 10:1

**9**

**9:05** 19:4

**A**

**ability** 26:12,16
**access** 18:23 26:3,14
**accessed** 15:17
**account** 7:22 8:5,8,14,16,18,23 9:3 20:14 21:13 22:10,13,15 25:16 26:1,15 28:14,16 29:12
**accounts** 17:18,19 25:24
**accurate** 7:19
**acknowledge** 19:25 28:7
**acknowledging** 24:9,15
**activated** 25:21
**activities** 10:15 12:17 20:17
**activity** 11:6
**add** 8:6
**address** 22:9 23:12
**afforded** 21:15
**agree** 10:15 13:22 19:21
**agreement** 18:5

**ahead** 12:3,11 24:19,23 26:25
**ahold** 23:7
**allegations** 14:20 15:4,22
**alleging** 15:10
**allowed** 8:13, 24
**Amendment** 20:4
**announce** 10:16
**announced** 10:19
**announcement** 10:14
**announcements** 10:22
**answering** 14:14
**answers** 5:5 24:17
**anymore** 18:4 25:10
**approach** 25:4,5
**April** 25:16
**area** 23:25
**argument** 30:1
**articles** 7:9 10:21
**aspect** 17:23 18:2,17
**assertion** 22:1
**assessment** 11:10
**association** 27:24
**assume** 22:4 25:23
**assumed** 26:7

**assumption** 12:23 15:14
**attorney** 4:15 19:25 21:7
**attorneys** 5:2
**authorization** 9:3
**authorized** 14:1
**availability** 12:15
**avoid** 12:14
**aware** 17:5,19 20:12,20 21:12 29:7
**awkward** 30:4

**B**

**back** 5:5 8:15 11:16 14:19 19:14 22:20 25:21
**bags** 14:11
**banned** 16:20 28:22 29:18
**based** 16:25 19:11,13 28:6
**basically** 26:17
**basis** 13:1
**bear** 9:16 20:12
**believed** 29:11
**bible** 13:5
**big** 5:2
**bio** 23:1
**bit** 23:14 24:23 28:20 30:4
**block** 16:25 17:8
**blocked** 15:22 16:23 17:8,10,12, 17,20

**break** 25:14
**broadcast** 11:6
**bunch** 17:20 25:23,25
**business** 8:5,6 9:5 19:16 23:17

**C**

**calendar** 19:15
**call** 19:8
**called** 4:6,17 9:3 29:9
**candid** 18:15
**cap** 8:20
**care** 18:10 30:15
**case** 5:15 6:14 17:24 20:21 21:3, 13
**cases** 21:17
**Celebrities** 23:25
**chance** 29:25
**choice** 12:7
**chop** 6:1
**chose** 23:22
**Circuit** 20:15
**city** 6:16,17 9:10,11,15,16 10:14,20 11:7 12:17 14:10,15 15:16,17 18:21, 22 19:2,6 21:12 22:12,16,21,24 23:2,10,12,13 27:25 28:4
**city's** 16:4
**civic** 27:23
**classify** 23:24
**clear** 6:6,11 15:24 21:6,10 26:14

FREED, JAMES
12/29/2020

Index: click..fair

click 9:9

client 16:24 17:8

college 7:22,23 8:19 13:8 15:12

command 26:19

comment 11:19 12:6,7,13, 16 14:5 15:7 16:21 29:18,23

commenter 29:23

commenting 28:23

comments 7:9 11:22,24 14:23 15:9,22 16:2,24, 25 17:25 18:6,8 20:3 24:16 29:21

communication 25:17

community 11:1,9 17:6,11

communitycomments@porthuron.org. 22:11

complaint 10:1,2 15:2,5 21:22

component 27:14

computer 5:24,25

concerns 5:19

concluded 20:16 30:19

confirm 7:16

connection 14:1

connections 27:8

considered 27:15

constituents 28:4,8

constitute 13:25

Constitution 29:8

contact 12:5 22:8

continue 9:14

continued 9:17

control 26:12, 14

convenience 22:25

conversion 8:14 22:13,15

convert 8:15, 19,24

converted 8:20 15:12

copied 23:1

correct 5:22 6:17,20 7:14,15 9:18,19 11:23 12:23 19:7 26:19

counsel 30:21

country 27:23

couple 5:1 27:14 30:13,14

court 6:9 24:14

courts 20:5

COVID 12:20 16:5

cracked 4:13

create 8:5

created 23:4

creeped 17:4

creepy 15:7,8

criteria 12:24

criticized 16:3

customary 12:25

---

D

date 8:3,12

day 9:12 19:9

days 17:17 25:13

December 4:2

decided 19:10

default 22:5

Defendant 6:13

deleted 14:22 15:22 16:5,13 17:15,25 18:6,8 29:24

deleting 16:4 20:3 24:15

depends 19:8

deposed 4:25

deposition 4:17,20 5:18,20 30:19

depositions 5:3 16:10

derogatory 18:9

designation 9:20

details 20:20

developed 12:25

device 15:17 18:22

dictated 13:1

difference 6:22 7:3 27:12

difficulty 17:23

dinner 13:4

direction 26:19

directs 5:13

disable 26:1

disabled 25:16,22 26:2

discovery 18:1

dispute 15:2,4, 11,23 16:6 17:21 19:17,22

disputing 17:15 20:2,3

distancing 12:19,22

docks 12:18

dog 13:4

Donald 20:13

doubt 5:15

downloadable 18:2

driver's 25:19

due 12:20 29:10

duly 4:7

---

E

e-mail 22:9 23:4,12

earlier 16:10 22:11

early 12:18

eating 7:10

education 21:15,20

Ellison 4:11,15 6:8,12 16:15,19 21:5 25:2 30:7

emotional 5:20

dinner 13:4

employees 17:12

engage 8:22

entire 25:12

equally 7:12

essentially 17:6 19:13 25:17

establish 17:24 29:15

exact 8:12

EXAMINATION 4:10

exempt 19:8,14

Exhibit 21:21

experience 28:6

explain 7:2,20

explanation 25:16

---

F

Facebook 6:19,23,24 7:1,3, 4,5,6,8,11,13,17, 18,21,25 8:3,8, 13,14,16,21,23, 24 9:3,4,17 10:7, 8,11,19,23 11:5 13:2,11,14,20,24 14:2,22 15:5,12, 20 16:21,22 21:23 22:13 23:10 25:10,16, 19 27:7,8,9,11 28:7,9,14,24 29:19

faces 17:3,13

fact 28:8

factors 21:2

facts 20:3

fair 10:24 11:9 12:11,20 13:19 14:3,7,14 15:19 17:22 20:6 21:6

FREED, JAMES
12/29/2020

Index: fake..likers

22:23 24:8 27:6
29:13

**fake** 17:19

**familiar** 29:10

**family** 8:22
11:18 13:4 18:12
26:10 27:22
28:13

**fan** 5:3

**fashion** 28:24

**fast** 6:9

**feature** 11:25
12:6

**features** 12:4

**feeling** 7:10

**felt** 18:8

**fight** 5:10,14

**figure** 9:5
23:15,18,24 24:2,
5

**filed** 21:22

**find** 8:2 17:24
19:15 23:10 25:9
26:13

**fine** 4:14

**fire** 4:21

**fishing** 12:18,
21

**flawless** 6:4

**folks** 8:3 16:2

**folksy** 25:5

**follow** 8:9,21
14:5 27:13,15,24

**follow-ups**
30:14

**followers**
27:12 28:2

**form** 5:12 12:25
21:1

**format** 28:22

**forward** 5:16

**found** 13:5,6,7

**foundation**
21:1

**frank** 18:25

**Freed** 4:5,12
6:8,13 9:17 16:9

**Freed1** 6:20
7:17 9:20

**freely** 5:20

**friend** 8:4,6
13:16,24,25 14:3

**friendly** 25:4

**friends** 7:6,25
8:1,22,25 13:20,
22 15:14 27:7,22
28:15

**front** 22:9

**fun** 18:16 24:13

**function** 22:3

**functions** 7:13

**G**

**gave** 23:18
29:25

**general** 23:5

**generally** 10:7

**get all** 5:6

**give** 5:5 7:21
22:1 28:25 29:1,
22

**good** 4:15 21:21

**Google** 8:2
25:24

**Googled** 8:13

**government**
23:21 24:4

**graduated**
7:22

**grocery** 28:11

**ground** 4:18

**group** 27:24

**guess** 11:3
19:20 21:7,25
24:14

**guys** 18:3

**H**

**happen** 27:6

**happened**
25:10

**harassed** 17:7

**hard** 25:4

**hate** 18:15

**health** 5:19

**hear** 10:22

**heard** 14:24
16:1,12 21:17
29:17 30:1

**helping** 24:24

**hereto** 30:21

**Hey** 24:20

**hindsight** 23:7

**history** 7:21

**hold** 9:23 23:20,
21 24:3

**honest** 15:4
17:4

**hour** 30:11

**hours** 19:16
22:3

**Huron** 6:17
9:11 15:16 19:7
22:16,22,24
23:12,13 28:1,4

**I**

**idea** 26:2 28:5

**identification**
9:25

**identified**
27:17

**identifies**
23:14

**imagine** 17:23

**improper** 5:11

**inappropriate**
15:9

**inaudible**
24:11

**individuals**
14:23

**information**
7:9 10:21,25
22:8,25

**initial** 11:6

**inquiry** 23:6

**inspiring** 13:6

**interacting**
28:9

**interested**
13:11

**interesting**
13:5,6,8 18:16,18

**invitation** 12:8

**invite** 11:24
12:15

**involvement**
18:21

**involving**
21:13

**issue** 12:8

**issues** 24:14

**J**

**James** 4:5,12,
14,15 6:13,20
7:17 9:17,20 10:3
16:9 20:24 21:6
24:20

**Jenny** 13:15
14:10

**Jim** 4:12

**job** 28:19

**jobs** 15:15

**joke** 12:21,22

**judge** 26:15

**June** 9:12 25:21

**K**

**Kevin** 4:16

**kid** 26:11

**kids** 15:9 28:13

**kind** 11:17

**kneeling** 7:25

**knew** 14:18

**knowledge**
12:3

**L**

**lack** 28:2

**late** 19:10

**lawn** 14:11

**lawsuit** 4:16
11:17 14:20 20:2

**lawyer** 25:4

**lawyers** 5:10
20:5

**lay** 4:18

**leaf** 14:11

**learn** 21:16

**left** 24:5

**legal** 21:11
24:14

**legalese** 30:5

**license** 25:19

**life** 4:25 21:9

**likers** 28:3

FREED, JAMES
12/29/2020

likes 27:12

limit 8:4

limitations 7:6

Lindke 4:16
14:21

link 23:13

litigation 20:13
25:5

locate 25:9

log 26:4,5

longer 20:9

lot 8:3,9 13:17
19:21 27:23 30:5

lots 17:7

love 28:12

lucky 4:24

Lynn 13:15
14:10

## M

machine 15:17
18:22

made 10:8
11:16,17 12:16
14:1,21,23 15:8
17:19

majority 13:3
24:17 27:21

make 5:3 6:6,10
10:22 11:15
15:24 26:1 30:1

makes 24:13

making 12:22

man 4:24

manager 6:17
9:11,15,17 11:7
15:16 19:2,6
21:12 22:12,21,
24 23:10

March 19:4
25:15

max 8:7,10

mayor 16:3

Meaning 9:4
12:2,4

media 25:14

medial 25:15

meeting 13:18
19:10

members 28:8

mental 5:19

mere 22:25

message 11:8

messaged
12:5

messaging
12:4

methodology
29:3

months 21:16
25:13 26:2

morning 4:13,
15 19:5,12

multiple 10:6
15:15

## N

necessarily
11:5 13:24

needed 30:15

neighbor
14:17

newspaper
10:21

nice 28:19

night 19:10

normal 19:5,16

north 27:10

note 26:20

notice 29:1,16,
23

number 27:18
28:2

numerous
17:19

## O

object 5:7

objection 5:9,
10 20:25

obligation
29:8

obligations
12:19

Occasionally
5:7,23

occurred
22:14

October 26:5

office 14:21
23:20,21

official 19:2
20:18 23:12,19,
20,23 24:2,3 29:7

one's 5:8

online 25:8

open 12:18 22:4

operated
15:14

operating 28:6

operation
10:11 11:4 14:22
16:6

opinion 21:11

opportunity
15:25 28:25 29:1,
17 30:1

opposed 7:18

option 23:18
24:3

overlap 27:13

overwhelming
27:21

owns 7:12

## P

p.m. 4:3 30:19

painless 5:4

Paragraph
10:1

part 9:14 10:1,
10 11:4,12 14:20
18:1

parties 30:21

parts 10:25

pasted 23:1

people 6:3 8:5,
7,9,20,21 11:9
12:4,13 14:4
15:8,23 17:6,7,20
18:11 23:6 25:23,
25 27:10,17,18,
19,21,22 28:12

people's 16:4

perfectly 29:6

person 7:12
23:17

personal
13:10,25 15:5,11,
19,20 18:20,24,
25 19:22 20:9
22:13 26:12 27:3
29:12

perspective
23:9 24:16

Phil 19:20

Philip 4:15

photo 25:19

photographers
8:8 24:1

photos 13:4
26:10,11

phrase 13:21

physical 5:19

pick 23:17

picked 24:1

picking 14:11

picture 11:18

pictures 13:4
15:10 28:12

place 12:20
20:22,25

point 18:19
20:9,13

ponder 17:16

Port 6:17 9:11
15:16 19:7 22:16,
22,24 23:12,13
28:1,4

posed 14:15

position 5:18
24:3

possibly 29:24

post 7:9 10:8
11:19 12:16
14:15 15:20
28:23

post-
deprivation
29:16,22

posted 7:12
16:2 17:9 18:11
19:4

posts 10:6,11
11:22 12:13 13:1,
14,17 16:4,13

PPOS 17:7

pre- 29:22

pre-
deprivation
29:16

prefer 4:12

premise 18:14

present 16:10
24:10

**president** 20:14,15 21:13

**press** 10:20

**presumption** 18:20 27:3

**pretty** 13:7

**prior** 12:24

**private** 7:24 8:23 18:14 20:14 22:2 26:7,8,9

**problems** 5:24,25

**procedural** 29:9,16

**process** 9:14 25:18 26:2 29:10

**produce** 18:1

**profile** 6:24 7:4, 5,6,11,18 8:14

**profiles** 7:8

**promised** 30:10

**provide** 29:15

**public** 9:5 14:8 18:19 20:16,17 23:9,15,18,19,20, 23 24:1,2,4 26:7 28:8 29:7

**publically** 26:18

**publish** 26:17

**published** 26:21

**purposely** 23:22

**purposes** 9:25

**pushback** 22:1

**put** 11:1 12:19 13:2 22:25 23:2, 4,8,21 26:10,11

**putting** 12:17

---

**Q**

**question** 5:8,9, 11,13,14,17 10:10 12:12 14:10 15:18,19 16:11,13,16,18 18:18 19:21 20:7, 8,11,12 21:1 24:9,18,20,22,25 26:7 27:4,5 28:18,21 29:14, 21 30:5

**questions** 5:2, 5,6 14:14,16 24:17 25:7 28:20 30:8,12,13,18

**quick** 5:3 19:18

**quicker** 24:24

**quickly** 25:22

---

**R**

**rare** 16:23

**reactivate** 26:18

**reactivated** 25:20

**read** 14:25 15:2, 21

**readily** 10:20

**realize** 8:4

**reason** 15:6 28:16

**reasoning** 23:3 25:23

**recall** 13:18 17:1,9,13,16 18:13

**recitation** 20:18

**reciting** 21:3

**recognize** 13:17

---

**record** 6:6 15:24 16:8,9 29:15

**record's** 6:11

**records** 17:7

**releases** 10:20

**remember** 9:7 17:2 23:16

**repeat** 6:10

**repeating** 6:1

**rephrase** 12:14

**report** 15:21 25:24,25

**reporter** 6:9

**represent** 4:16

**representatio n** 11:15

**requested** 30:20

**requirements** 9:1

**researching** 25:25

**respect** 20:7

**respective** 30:21

**responded** 13:14 14:12,19

**response** 11:22 12:16 16:3, 5

**rest** 21:9

**restored** 29:25

**reverberate** 11:8

**rhyme** 15:6

**role** 20:17

**rude** 6:2,5

**rules** 4:19

---

**S**

**salary** 19:8,13

**scan** 25:18

**schedule** 19:13

**scholarly** 18:17 20:7,8 24:9

**school** 17:11

**scopes** 27:25

**screen** 10:3,4 11:16 19:4

**scroll** 23:14

**section** 21:23 22:8

**sector** 7:24

**select** 22:6

**send** 25:19

**set** 28:20

**setting** 22:5

**shape** 5:12

**share** 7:9 9:23 14:4

**shared** 13:3,4,5

**shortcut** 6:16

**shot** 10:3 11:16

**Shoudy** 5:6,13 16:8 20:22,24 24:13,20,22 30:17

**show** 9:1

**shut** 28:9

**Signature** 30:20

**similar** 7:5

**simply** 28:3

**sir** 10:5

**smiley** 17:2,13

**social** 12:18,21

---

25:14

**sort** 9:2 20:6

**sounds** 4:20

**sources** 10:21 11:1

**spar** 24:14

**speak** 27:23 30:10

**speaking** 10:7

**special** 9:2

**specifically** 17:1,10,14 18:12

**spoken** 27:23, 24

**spot** 11:21

**stalked** 17:6

**standard** 12:24

**standards** 29:3

**standpoint** 6:23 21:12

**start** 4:18

**state** 12:19

**statements** 28:23

**status** 9:2 28:24

**stopped** 28:11

**store** 28:12

**stroke** 20:1

**stuff** 11:1 14:5 17:12 20:4

**stupid** 18:10

**sued** 18:16

**surprised** 19:25

**suspected** 17:18

**suspended** 29:18

FREED, JAMES
12/29/2020                                                      Index: switch..Zoom

**switch**  19:18

**sworn**  4:7

---

**T**

**takes**  30:15

**talk**  6:9 15:25

**terms**  12:14
28:21

**testified**  4:9
22:11

**testify**  4:7,17

**testimony**
14:24 16:1,12

**thing**  5:16 24:24
27:16

**things**  7:7,11
13:11 17:5 21:16
29:9

**thinking**  23:3

**thought**  15:7
17:20 18:24

**thousand**
27:14

**thousands**
27:18

**threw**  23:6

**tied**  30:5

**time**  4:21 5:12
8:13,15 9:10
10:22 14:16
16:20,23 17:2,3
19:5,11 21:15,19
23:3 24:13 25:12
30:15

**times**  6:4

**today**  5:2,18,21,
23 24:17 30:12,
16

**Todd**  30:10,12

**Todd's**  5:24

**town**  4:21

**traditional**
13:21

**transcript**
16:11,17

**treat**  15:11

**treated**  13:10

**treating**  15:20

**trouble**  25:6

**true**  9:21

**Trump**  20:13
21:13

**truth**  4:8,9

**Tuesday**  4:2

**turn**  11:25 12:6

**turned**  12:9

**Twitter**  20:14
21:13

**type**  10:8

**types**  13:1 29:8

---

**U**

**uh-huh**  6:3

**ultimately**
20:16

**ums**  6:3

**un-publish**
25:12

**un-published**
26:6,13 27:4

**uncommon**
25:11

**understand**
7:3,8,16 10:10
11:3 29:13

**understandin
g**  7:1 10:6 11:13

**unique**  24:10

**Unlike**  5:2

**unrelated**
14:15

**user**  6:20,23 7:2
9:20 28:23 29:17

**users**  14:2
16:21 24:16

---

**V**

**vacation**  30:9,
10

**Val**  6:6,8

**vast**  27:21

**verses**  13:5

**versus**  6:23 7:4

**videos**  13:6

**view**  26:16

**viewpoint**
24:11

**violation**  20:5

---

**W**

**wait**  20:24
24:20,22,24

**wanted**  8:9
26:16

**warrant**  9:2

**website**  23:2,4,
13

**weeks**  25:13

**weird**  17:2
18:13 20:11
28:21

**well-known**
23:24

**wife**  15:9

**word**  12:8,15
13:19 26:17 27:7
30:12

**words**  7:2

**work**  6:10 7:1
15:19 23:21 28:3

**worked**  7:23

27:22

**working**  19:6

**world**  13:20

**write**  11:18,22
18:10

**written**  12:25

**wrote**  17:1,2,14

---

**Y**

**year**  4:22 8:13

**years**  15:8
18:11

**Youtube**  13:6

---

**Z**

**Zoom**  4:1 6:4