# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN LINDKE,
    Plaintiff,

    v.

JAMES R. FREED,
in his personal and official
capacities,
    Defendants

_____/

Case No.: 20-cv-10872
Honorable Mark A. Goldsmith
Magistrate David R. Grand

**RESPONSE**

OUTSIDE LEGAL COUNSEL PLC
PHILIP L. ELLISON (P74117)
Attorney for Plaintiff
PO Box 107
Hemlock, MI 48626
(989) 642-0055
(888) 398-7003 - fax
pellison@olcplc.com

TODD J. SHOUDY (P41895)
VICTORIA R. FERRES (P78788)
FLETCHER FEALKO SHOUDY &
FRANCIS, P.C.
Attorneys for Defendant
1411 Third Street, Suite F
Port Huron, Michigan 48060
(810) 987-8444
tshoudy@fletcherfealko.com
vferres@fletcherfealko.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## COUNTER STATEMENT OF QUESTIONS PRESENTED

I.
Is Defendant entitled to summary judgment?

Plaintiff answers:  No.

# MOST APPLICABLE AUTHORITY

FRCP 56

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017)

*Knight First Am. Inst. v. Trump*, 928 F.3d 226 (2nd Cir. 2019) (*Knight I*),
*en banc denied*, 953 F.3d 216 (2nd Cir. 2020) (*Knight First II*)

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)

*Signature Mgt. Team, LLC v. Doe*, 876 F.3d 831 (6th Cir. 2017)

**INTRODUCTION**

"One of the prerogatives of American citizenship is the right to criticize public men and measures…" *Baumgartner v. United States*, 322 U.S. 665, 673-674 (1944). When one of those public men "creates a Facebook page, [he] generally opens a digital space for the exchange of ideas and information." *Davison v. Loudoun Cnty.*, 267 F.Supp.3d 702, 716 (E.D. Va. 2017). Social media platforms like Facebook provide "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). This case, based on the Facebook social media platform, is just like *Knight First Am. Inst. v. Trump*, 928 F.3d 226 (2nd Cir. 2019) (*Knight I*), *en banc denied*, 953 F.3d 216 (2nd Cir. 2020) (*Knight First II*). There, then President Trump blocked Twitter users and impeded the flow of online conversations regarding his @realDonaldTrump Twitter account—an account he opened and used before he became President. After becoming President, Trump used the social media platform to make public statements on a wide variety of subjects and the public, in turn, was able to respond to and engage with him and other users. The Second Circuit held this creates a public forum and it is a First Amendment violation when the public figure excludes private persons and their communications from the dialogue because they express

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

views with which public figure disagrees. See also *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Attwood v. Clemons*, 818 Fed. App'x. 863 (11th Cir. 2020); *Robinson v. Hunt Cty., Texas*, 921 F.3d 440, 447 (5th Cir. 2019).[1]

If this Court were to swap Defendant Freed for President Trump and Facebook for Twitter, we have the same basic case. Summary judgment is not warranted in favor of this content- and viewpoint-suppressing city manager defendant.

## COUNTER STATEMENT OF FACTS

1.     Contested. Defendant has not offered any objective evidence of the same other than his own testimony. The objective evidence is that the "JamesRFreed1" Page is registered to the City government. **Exhibit 3.**

2.     Contested. Defendant has not offered any objective evidence of the same other than his own testimony. He has not shown that he had or has more than 5,000 "Facebook friends." He failed to offer objective evidence that a conversion took place. Moreover, Freed has a personal Facebook profile under the username "james.freed.3192."

---

[1] There is a general consensus. *E.g. One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019); *Faison v. Jones*, 440 F. Supp. 3d 1123 (E.D. Cal. 2020); *Felts v. Reed*, 2020 U.S. Dist. LEXIS 224489 (E.D. Mo. 2020); *Windom v. Harshbarger*, 396 F.Supp.3d 675 (N.D.W.Va. 2019); *Scarborough v. Frederick Cnty. Sch. Bd.*, 2021 U.S. Dist. LEXIS 22977 (WD Va, Feb. 8, 2021); but see *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021) (candidate for office not a state actor when banning user).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

3.      Undisputed but it is not material that he is "unelected."

4.      Undisputed.

5.      Contested. The assertion is untrue. **Exhibit 3.**

6.      Undisputed except that the JamesRFreed1 Facebook Page is not a personal page or profile; it is registered to the City of Port Huron. **Exhibit 3.** It is undisputed that the narrative about section contains the recited language but it is not material. Such is a common practice on official government's media accounts. For example—



https://twitter.com/GovWhitmer (**Exhibit 15**).

7.      Contested. Freed has not offered any objective evidence of the same other than his own testimony. Moreover, the JamesRFreed1 Facebook Page is registered to the City government. **Exhibit 3.**

8.      Contested. The assertion is untrue. See **Exhibit 2.**

9.      Undisputed that Freed is the sole self-appointed administrator of his Facebook page. Contested that "no City employee operates or maintains the Facebook page JamesRFreed1" as Freed is such an employee. See

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Paragraph 3, supra.  Contested that City of Port Huron provided no support, monetary or otherwise, for Freed's Facebook Page and has no involvement with his page. At minimum, the JamesFreed1 account was associated with a city email account which is maintained by City employees using city time and resources. **Exhibit 3.**

10.    Undisputed as to Mr. Freed is the only person he decided to operate the disputed Facebook Page. Others have the "ability." It is undisputed that Freed opened a public forum on interactive  portion of Facebook.

11.    Contested. The assertion is untrue. What Freed argues as "personal" when it is not actually such. These posts are really the furtherance of his marketed public persona as part of his public office. This is not new or unusual (or even improper) in politics. E.g. https://t.co/LjLLIjvP1C (POTUS Valentines for Mrs. Biden, **Exhibit 16**); https://t.co/rxslEoKY1b (Senate Majority Leader's grandson winning, **Exhibit 17**); https://t.co/pUpsYe0UFq (Governor Whitmer's family dogs, **Exhibit 18**).

12.    Undisputed that the posts were made but disputes that these posts were "personal." See response within the preceding paragraph.

13.    Contested. Freed has not offered any objective evidence of the same. However, this assertion is not a material fact. Moreover, many of the

"City-related posts" were more than just announcements. **Exhibits 2 and 5.**

14.    Undisputed but there were many more, see **Exhibit 5.**

15.    Contested in part. There is no evidence presented of what "like the rest of the Facebook community" was or was not posting. If Mr. Freed tries to mean that governments and government officials began posting on Facebook posts in response to and about the COVID-19 pandemic, such would be undisputed.

16.    Undisputed; however, this is not a material fact other than to show that the JamesFreed1 account was distributing information that the City's Chief Administrative Officer believed the citizenry of Port Huron would find needed, useful, and helpful as residents.

17.    Contested that Freed never "directed any of his posts to City residents." E.g. **Exhibits 2 and 5.** Undisputed that Freed answered questions posted in the comments section under the "posts" Freed made to the Facebook Page, though Freed has failed to preserve all the comments when he "unpublished" his Facebook Page, **Freed Dep., ECF No. 23-2, PageID.687-688,** and failed to produce the same in discovery.

18.    Undisputed that Mr. Freed blocked numerous people from the Facebook Page and deleted comments when he did not like the content of the comments, including Plaintiff Lindke and others. However, these actions

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

were not because he deemed his account as personal but rather because the comments were highly critical of his actions and inactions as a public official as well as the actions and inactions of his fellow City government officials. Freed committed viewpoint and content-based discrimination in violation of the First Amendment.

19.    Contested. Plaintiff Lindke never "personally attacked" Mr. Freed. See **Exhibit 5.** However, Plaintiff Lindke did, on the Facebook Page, critically question Freed's personal and professional conduct in service as City Manager of the City of Port Huron. None of the comments on JamesFreed1 Facebook page were or could be considered "personal attacks" and Freed has failed to preserve and present the same.

20.    Undisputed. Further, Freed also deleted other comments on the interaction section of Facebook and blocked other users as well. **Exhibits 6, 7, 8, 9 and 10.**

21.    Contested that Plaintiff requested the 9,000 members of his Facebook group "Through My Eyes" also make posts. The deposition testimony cited does not establish the same. Undisputed that Freed deleted several other posts, but including those by Lindke and others. See **Exhibits 6, 7, 8, 9, and 10.**

22.    Undisputed that the Facebook Page is currently "unpublished"

and was not made available, in full, to Plaintiff and his counsel to support the basis of this case. Freed has committed spoilation by failing to preserve the Facebook Page's comments. Plaintiff cannot objectively confirm whether the events Mr. Freed testified to occurred or if the testimony is a fabrication.

## STATEMENT OF ADDITIONAL FACTS

23.    Facebook is a "social network" consisting of an online community to facilitate people, businesses, and institutions finding and forming connections through an exchange of different content. *Lane v. Facebook, Inc.*, 696 F.3d 811, 816 (9th Cir. 2012).

24.    There are two main types of users: the first are individuals who have "*Profiles*" and the second are "businesses, brands, organizations and public figures" who have Facebook "*Pages*." **Exhibit 1.**

25.    Users of Facebook can "post" or digitally share text, written messages, photographs, videos, or links to other articles or webpages on their respective Profiles (for individuals) or Pages (for businesses, brands, organizations and public figures). See e.g. **Exhibit 5.**

26.    As users "post" their text, written messages, photographs, links to articles, and videos, these aggregate within each user's "newsfeed" which creates an ongoing list of activities happening on Facebook Pages and Profiles to permit a user to "see what's going on" or going "viral" on

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Facebook, https://www.facebook.com/help/753701661398957/ (**Exhibit 19**)

27.    Here, for example, is a post from the official White House

Facebook Page and some comments thereafter—



28.    In addition, users can "like," "heart," "dislike" (i.e. clicking a

thumbs-up sign, heart, or an angry face) or otherwise "comment" in response

to the "posts." See Paragraph 27 *infra*.

29.    Everyone can comment on "public" posts. Users can also add

written "reply" comments to prior submitted comments. **Exhibit 20.**

30.    Comments are generally not moderated or pre-approved by

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

8

Facebook prior to being displayed online, but posts or comments can be removed, in infrequent instances, for not meeting basic "community standards" required by the social media platform as a term of its use. https://www.facebook.com/communitystandards/

31.  However, unfavorable comments of and regarding government officials, objections to government policies or announcements, and general dissent to ideas or concepts shared in "posts" are not improper uses under Facebook's community standards. https://www.facebook.com/community standards/

32.  Notwithstanding, the owner or administrator of a Page can delete comments/replies made in response to a post on the Page. **Exhibit 21**.

33.  He or she can also ban particular commenting users. **Exhibit 22**.

### City Manager and his Facebook "Page"

34.  Like many other public figures holding public office, City Manager James R. Freed has a Facebook "Page" (as opposed to a Profile) with a username of JamesRFreed1. See e.g. **Exhibit 2.**

35.  A Facebook "Page" is reserved for businesses, brands, organizations and public figures as oppose to his personal Profile which is for individuals. **Exhibit 1.**

36.  Freed separately has a personal Facebook "profile" being

"james.freed.3192." https://www.facebook.com/james.freed.3192; **Exhibit 1** ("You must have a *profile* to create a Page or help manage one.").

37.    On the Facebook Page, Freed regularly makes posts for general public dissemination, including things like official policy announcements and official city government communications; highlights of local business, nonprofits, and members of the community from, in, and involving the City of Port Huron for self-promotion; and pithy posts for general humor and enjoyment of the constituents of the City of Port Huron. **Exhibit 5**.

38.    Freed also further crafts his public "online" image by using photographs of his family and community stakeholders to broadcast to constituents that he, as part of his office, is a wholesome family man and an important member of the community. **Exhibit 5**.

39.    This is not new or unusual (or even improper) in politics. E.g. https://t.co/LjLLIjvP1C (POTUS Valentines for Mrs. Biden, **Exhibit 16**); https://t.co/rxslEoKY1b (Senate Majority Leader's grandson winning, **Exhibit 17**); https://t.co/pUpsYe0UFq (Governor Whitmer's family dogs, **Exhibit 18**).

40.    Freed's Facebook Page has been set to "visible to everyone;" however users "cannot contact [the] Page privately"—something to be expected with a "public figure" account. **Exhibit 4.**

41.    The "JamesFreed1" public figure Facebook Page is registered

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

with the City of Port Huron's physical address ("100 McMorran Blvd, Port Huron, Michigan 48060"), the City's website ("http://www.porthuron.org"), the City's general email address ("CommunityComments@porthuron.org"), and has a designated administrator of James Freed, the City Manager. **Exhibit 3; Exhibit 14.** Its registration lacks any indicia of private party status. *Id.*

42.    The photograph selected by Freed to be associated with the account (but was changed after this lawsuit started) is of Freed while at the City's offices and with him wearing his City lapel pin. **Exhibit 2.** This is the same official government picture as on the City Manager's website, https://www.porthuron.org/departments/city_manager/ (**Exhibit 13**).

43.    Citizens would "follow" Freed's Facebook Page "for city information." E.g. **Exhibit 6, DeWitt Dep., p. 7.**

44.    The posts made to Freed's Facebook "Page" permitted citizens to make "comments," both supportive and critical. See e.g., **Exhibit 2; Exhibit 10, Lindke Dep., p. 7.**

45.    A great example of confirming a public forum is Freed's post from March 26, 2020. **Exhibit 2**. By this example post, Freed was advocating how his local government ("we") supports Governor Whitmer's recent social distancing measures imposed as a result of the COVID-19 crisis and the City's complementary decision for early installation of the community fishing

11

dock that "we" (meaning the government) did for those who wish to "social distance while fishing." *Id.* In response, one user unrelatedly asked if the City of Port Huron will be picking up lawn and leaf bags soon, to which Freed confirmed the same by replying. *Id.* However, another user relatedly questioned the action of installing the fishing dock and whether it would be furtherance of the social distancing directives in effect in Michigan. *Id.* No reply was offered. *Id.*

46.     These individuals, like many other commenters, are not "real life" friends or family of Freed, but rather local residents and citizens.

47.     However and central to this case, Freed is not receptive to comments that were *highly critical* of his official actions, the actions of the Mayor of Port Huron (a political ally), and the actions or inactions of the City government.

48.     He simply deleted unfavorable comments and banned certain users from further commenting when not complimenting or supporting his desired message or viewpoint. This was confirmed several times over by deposition testimony.

### *Testimony of Commenters*

49.     Marjorie DeWitt, a local individual who works within the City, who testified that she was a follower Freed's Facebook Page for city information

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

for "at least a year." **Exhibit 6, DeWitt Dep., p. 7.**

50.    She explained right after the lockdown had started, she noticed one of Freed's post regarding Mayor Repp while inside of a local diner and her failing to socially distance. *Id.* **at 8.**

51.    DeWitt's comment in response to the photograph of the mayor not socially distancing was "good job social distancing, Mayor" as a "kind of a sarcastic remark." *Id.*

52.    She confirmed and knows that her "comment was deleted." *Id.*

53.    The comment was made to be "critical" of the Mayor Repp for not following—on more than one occasion—the mandatory health guidelines. *Id.* **at 13.**

54.    DeWitt has a strong interest in the topic because "being around people during this pandemic puts [her] children at risk who are immunocompromised." *Id.*

55.    She made the comment hoping the "message would cause change in the way the mayor operated out in public." *Id.*

56.    Freed deleted it. *Id.* **at 8.**

57.    DeWitt now does not trust Freed won't simply delete any such message again if she were to make it. *Id.* **at 15.**

58.    Janet St. John is a Facebook user who posted a comment to

13

Freed's Facebook Page. **St. John Dep., Exhibit 7**

59.    She testified that she had serious concerns about a local day care controversy involving a convicted sex offender.[2] *Id.* **at 8.**

60.    She was concerned there were no posts by Freed about what was going on and St. John "wanted to know why" not. *Id.*

61.    Her comment was deleted. *Id.* **at 12**.

62.    Angry about that, she added a comment containing a link to an ACLU article about the impropriety of deleting comments in such a forum. *Id.* **at 10.**

63.    That was deleted too. *Id.* **at 12.**

64.    She made these comments to make him "aware" and "look into it," and "do his job" to fight for the children of the community. *Id.* **at 13.**

65.    Instead, her comments were deleted. *Id.* **at 14.**

66.    Christine Woodley also testified she also made several comments to Freed's Facebook Page. **Exhibit 8, Woodley Dep.**

67.    Like Ms. DeWitt, Woodley commented on the same picture of Mayor Repp not socially distancing in the same local restaurant. She also commented several times about Larry Whitcomb, a twice-convicted sex

---

[2] For background, see https://www.fox2detroit.com/news/registered-sex-offender-said-to-be-working-at-michigan-daycare-by-ex-employees

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

offender, living off the grid in St Clair County. *Id.* **at 6.**

68.     All told, she made eight to ten different comments. *Id.* **at 14.**

69.     These were all deleted. *Id.*

70.     When those comments were deleted, Woodley also posted a link to the ACLU article about how "public officials can't block critics on Facebook."[3] *Id.* **at 9.**

71.     That too was deleted. *Id.* **at 11.**

72.     Robert Pecar also offered testimony that he posted some comments about the right of free speech in response to when comments made by others were being deleted by "whoever was running that page and violating our right to free speech" (which we now know to be Freed). **Exhibit 9, Pecar Dep., p. 22.**

73.     He was attempting to advocate to a government official that "there is no place for censorship in America." *Id.* **at 25-26.**

74.     Ironically and frustratingly, Pecar's comments were deleted and he was banned as a user from Freed's Facebook Page. *Id.* **at 22, 27-28.**

75.     In Pecar's words, Freed "came in and blocked us all, shut down

---

[3]     That article is available at https://www.aclu.org/blog/free-speech/internet-speech/court-rules-public-officials-cant-block-critics-facebook which discusses the then-recently issued decision in *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019).

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

our voice and went on about his merry little way." *Id.* at 30.

76.     Finally, there is Plaintiff Kevin Lindke who also posted on Freed's Facebook "Page" four to six comments directly questioning the early inaction and inattention of government officials from the City of Port Huron (including Freed and Port Huron Mayor Pauline Repp) in response to the COVID-19 pandemic. **Exhibit 10, Lindke Dep., pp. 22-23.**

77.     Lindke raised a similar concern about Mayor Repp captured in the photograph while she was at a local diner in Port Huron and about the City's response to COVID-19. *Id.* **at 33, 35-36.**

78.     All were deleted. *Id.* **at 51.**

79.     Lindke was banned from posting anything further. *Id.* **at 50-51.**

*Freed Deletes and Bans*

80.     In summary, the deleted comments made were critical but never crude, vulgar, or threatening. *Id.* **at 58**; **Exhibit 6, DeWitt Dep., p. 12**; **St. John Dep., Exhibit 7, p. 13; Exhibit 8, Woodley Dep., pp. 14-15.**

81.     And when the comments and questioning by those connected in various ways with the City of Port Huron were too critical (like Lindke, Pecar, Woodley, St. John, and DeWitt), Freed took two general actions. First, he simply deleted (i.e. destroyed) the unfavored comments. Second, Freed prohibited (i.e. banned) those particular commenting-users from ever posting

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

any other additional comments to the Facebook Page thereby precluding any further comments critical of the government officials of the City of Port Huron. E.g. **Exhibit 10, Lindke Dep, pp. 60-61.**

82.  Yet, when the comments were not critical, they were left untouched and many times further responded to by Freed himself. E.g. **Exhibit 2.**[4]

83.  After the close of discovery, Freed moved for summary judgment. **ECF No. 23.**

## COUNTER ARGUMENT

Freed asserts five reasons why dismissal by summary judgment is warranted. All fail.

## I.    State Action

Freed first argues he is not a state actor who undertook state action. The argument is meritless. The "public figure" Facebook Page, while peppered with both "ah shucks" family postings together with formal policy and government announcements, has the trappings of his public office. To be state action, the complained of actions by the person must be "related in

---

[4] After deleting critical comments and banning disfavored Facebook users (i.e. commenters), Freed was informed that such violated of the First Amendment. Freed, in a most ironic fashion, deleted *those* comments and continued to ban Facebook users who were protesting censorship.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

some meaningful way either to the actor's governmental status or to the performance of his duties." *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001). Distributing information about the City, its programs and policy decisions, and providing notice of actions it is taking or not taking is easily considered part of a city official's duties. Freed's Facebook Page is and was understood to be state action.

The record supports this conclusion. First and foremost, Freed is the City Manager and was operating a Facebook Page which is specifically reserved to and publicly provided for "public figures." **Exhibit 1.** The account was listed as registered to City Hall (rather than Freed's home), linked to the City's website and general email address (as opposed to a personal one), and announces that "under the City Charter Mr. Freed serves as City Manager." **Exhibit 3.** No one else would be permitted to maintain a "public figure" Facebook Page as the City Manager of the City of Port Huron without being an official part of the City government.  Moreover, Freed was making these posts while serving and being paid as the City Manager. **Exhibit 4.** He used city time (and by extension, its resources) to make posts to the Facebook Page. Under the City's Internet policy, all data… whether sent from or received within this system are the property of the City of Port Huron. **Exhibit 11, City of Port Huron Admin Reg. 9-9, ¶2.** "[P]ublishing unrelated

18

to work is prohibited." *Id.* **¶6.**

While Freed now tries—post lawsuit—to treat a "public figure" Facebook Page as a second personal account, it is not—by function or by status. President Trump tried the same argument in *Knight I* and it was rejected. When the social media user operator becomes a public figure and the social media account is allowed to become "a channel for communicating and interacting with the public," First Amendment obligations apply. *Knight I*, 928 F.3d at 235. It is only when a public figure "uses his account in ways that differ from those presented" in *Knight I* does the issue become a "fact-specific" inquiry. *Id.* at 236.[5,6] A government official's posting and interacting with the public on matters of public concern on a city registered social media pages is a state actor undertaking state action.

Freed also suggests that no one else helped him operate this Page. But that cannot be true. There are countless examples why not, but a great

_____

[5] The Second Circuit explain the inquiry is "fact-specific" depending on how the official describes and uses the account; to whom features of the account are made available; and how others, including government officials and agencies, regard and treat the account. *Knight First I*, 928 F.3d at 236.

[6] Repeatedly throughout the posts involving announcements, programs, and decisions, Freed almost always uses the word "we" when describing what was happening or had happened, rather than "I" or "me" or him and his wife. **Exhibit 5.** This is support for the notion that these are actually "government posts" and not personal posts belonging solely to Freed.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

one is on bates-stamp 63 of Exhibit 5. In that post, local school superintendent Jamie Cain and Freed held a joint press conference. Query: because Freed is in the picture, who took the photo? See also, e.g., **Exhibit 5, bates-stamp 73, 75, 87.** Someone was helping him.

The "JamesFreed1" Facebook "Page" is simply not now a privately owned account (Exhibit 3), even if it was originally created that way. *Knight I* explains why.[7] But even this Court disagrees, that is a decision for the jury, not this Court on motion. On a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jackson v. VHS Detroit Rec. Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016).

## II.   Public Forum

Next, Freed argues that if he is a public figure (which is he is), the Facebook Page—for use by public figures—was not a public forum. That too is nonsense. Social media platforms provide "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 137 S. Ct. at 1737. A public official's "Facebook <u>Page</u> bear the hallmarks of

---

[7] Throughout the brief, Freed implies that comments "personally attacked" him or this family. There is no offered proof of this; frankly, it is just untrue.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

a public forum." *Davison*, 912 F.3d at 682.[8],[9]

On the Facebook Page, Freed regularly posted government news, policy announcements, and more about what "we" were doing. **Exhibit 5.** Beneath each posted item, Freed left open the ability for citizens to place comments in response to the specific posts, and would sometimes respond. **Exhibit 2.** Commenting by the public in such a forum is subject to First Amendment protections. The only reason he now argues that it is not an open forum is because he is in legal pickle for limiting viewpoints and imposing content-based punishments contrary to the First Amendment. He left open and invited public commenting and actively responded to questions, requests, statements, and complaints by citizens. Yet when those comments were "too critical," he removed them and banned the commenters. The First

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

---

[8] There is no need to go into great detail about what type of forum this is because viewpoint discrimination is prohibited in all forums. *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 fn.2 (4th Cir. 2006).

[9] This Court might consider splitting up the Facebook Page into "columns" as done by some courts. See *Davison*, 912 F.3d at 686 (splitting social media sections in columns and designating one portion as the forum). This Court could more narrowly find that a public official cannot delete comments or ban users who criticize a public official's actions or government on that part of government-related posts made in the interactive forum left open for communications (i.e. commenting) about matters of public concern. Because no one personally "attacked" Freed or his family members as to posts about them, he had no grounds to retaliate by user-banning and comment-deleting for criticizing municipal action and inaction from posts about City government and its officials.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Amendment does not permit the same. If the Supreme Court's First Amendment jurisprudence makes anything clear, it is that speech may not be disfavored by the government simply because it offends. See *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (listing cases).

Like President Trump in *Knight I*, Freed concedes he deleted comments that criticized him or his government's policies. **Freed Dep., ECF No. 23-2, PageID.676**; see also *id.* **at PageID.679** ("I deleted comments I didn't like" including ones that were "derogatory towards me"). Others confirmed that their comments were deleted and they were banned too. **Exhibits 6-10.** The question is whether the Facebook Page that was 1.) limited for use by "public figures," 2.) had regular postings and announcements about government policies, news, information, and announcements, and 3.) had open commenting capacity as those government policies, news, information, and announcements to which Freed would sometimes respond constitutes a public forum? *Knight* provides a clear answer: yes. *Knight First I*, 928 F.3d at 236.[10] This "public figure"

---

[10] "Because the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him. Here, a public official… hold[s] out and use[s] a social media account open to the public as an official account for conducting official business. That account has interactive features open to the public, making public interaction a prominent feature of the account. These factors mean that the account is not private."

Facebook Page is a public forum.

The Fourth Circuit in *Davison* echoed the same and has been followed as the norm. The government official—while claiming private status—created the Facebook Page, designated the page as belonging to a governmental official, clothed it in the "trappings of her public office," and listed her official contact information on the page, and added particular webpages to the Page. *Davison*, 912 F.3d at 683. Freed did the same thing. **Exhibit 3.** Moreover, the official in *Davison* (like Freed) placed no formal limitations on access to the Facebook Page and limit the ability make comments and posts to the interactive component of the Facebook Page. *Id.* at 686. The Fourth Circuit held the Facebook Page to be public forum. *Id.* at 687. This Court should and easily can too.

## III. Qualified Immunity

Next, Freed claims he was not reasonably informed by the precedents of the federal circuit courts and the Supreme Court to know that he could not commit discrimination based on content and viewpoint and is thusly entitled to qualified immunity. Again, that is nonsense. The Sixth Circuit has long held, based on long established Supreme Court precedent, that content-based restrictions on speech generally face strict scrutiny. *Carey v. Wolnitzek*, 614 F.3d 189, 199 (6th Cir. 2010); *Putnam Pit, Inc. v. City of*

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

*Cookeville, Tenn.*, 221 F.3d 834, 845 (6th Cir. 2000) (viewpoint discrimination is "an egregious form of content discrimination"). The Supreme Court has been even clearer—Freed "violates the First Amendment when [he denied] access to a speaker solely to suppress the point of view [] espouse[d] on an otherwise includible subject." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

Freed never disputes, by his motion, that these constitutional principles are well-established law. In fact, he never really talks about them. However, he instead suggests that such principles were not clearly explained to apply to internet communications to inform him of his legal responsibilities. Qualified immunity[11] balances "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The "pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).[12]

---

[11] Qualified immunity only immunizes defendants from *monetary damages*—not injunctive or declaratory relief. *Kanuszewski v. MDHHS*, 927 F.3d 396, 417-418 (6th Cir. 2019). The relief sought against Freed in his personal capacity for injunctive and declaratory relief is unaffected.

[12] "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 739.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Against the backdrop that the First Amendment applies to internet communications, the Second Circuit's *Knight I* decision in 2019 expressly taught Freed that what he was doing—i.e. repurposing a private social media account for public use once assuming a public office and then banning speech/users critical of public conduct—violated the First Amendment. *Knight I,* 928 F.3d at 226. The Fourth and Sixth Circuits also gave him reasonable prior notice too. The Sixth Circuit equally pronounced "internet speech receives *the same* First Amendment protection as other speech," like viewpoint discrimination and content-based regulations. *Signature Mgt. Team, LLC v. Doe*, 876 F.3d 831, 835 (6th Cir. 2017) (citing *Reno v. ACLU*, 521 U.S. 844, 870 (1997)). Discrimination via a Facebook Page also violates the First Amendment. *Davison, supra*.

Qualified immunity does not require the presentment of a case on all-fours factually. *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019). Instead, it only requires "fair and clear warning to officers" about what the law requires. *Id. Signature* gave sufficient notice as to internet speech. At the very latest, *Knight I* and *Davison* provided that notice as to newly identical similar circumstances. See *Barker v. Goodrich*, 649 F.3d 428, 435 (6th Cir. 2011) (fair warning can come from the Supreme Court and the circuits established at that time). Qualified immunity does not apply.

**IV.** *Monell*

A constitutional claim against a municipality[13] under § 1983 must be based on its own conduct as oppose to the actions of a rogue employee. See *Monell v. N.Y. City Dep't. of Social Servs.*, 436 U.S. 658 (1978). Thus, in a named-municipality and/or official-capacity suit, the entity's policy or custom, and not just their employee's singular acts, must have played a part in the violation of federal law. To meet the *Monell* standard, a civil rights plaintiff uses at least one of four methods to establish municipal liability. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Plaintiff asserts that *Monell* can be met via a custom or practice and by *Pembaur*'s particular decision-maker's decision.

First, the City allows, by custom and practice, the various departments to have and operate their own social media accounts and outreach, including having an open forum for communications. For example, the Police Department has its own.[14] The Parks & Recreation Department does too.[15] The City Manager did as well for what "we," the City, were doing. **Exhibits 3, 4, and 5.** As such, it is a custom and practice of City to allow for social

---

[13] In an official-capacity claim, the relief sought is only nominally against the official and, in fact, is against the official's office and thus the government entity itself. *Lewis v. Clarke*, 137 S. Ct. 1285, 1292 (2017).

[14] https://www.facebook.com/PortHuronPolice

[15] https://www.facebook.com/phrec

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

media accounts and allow for members of the citizenry to comment in an online digital forum. Moreover, the testimony of Lindke, Pecar, Woodley, St. John, and DeWitt all confirm that the deletion of comments and banning of users was not a one-off by Freed but well-established custom and practice across topics of public concerns and among various Facebook users. Because the City had a custom of allowing City officials to operate Facebook Pages in such a manner, such a custom creates *Monell* liability when such causes constitutional violations.

Second, *Monell* is also fulfilled "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Freed has such authority. The City Manager is "the Chief Administrative Officer" and the head of the City's "administrative branch." **Exhibit 12, §5-1.** He "direct[s] and supervise[s] the administration… of the City" and "establish[es] any rules necessary to carry out the duties of the office of City Manager." *Id*. **§5-1(11).** He has been authorized to "perform such duties as are provided by" his own directives. *Id.* **§ 5-4(b).** One such duty is communicating with the public. **Exhibit 13.** Here, Freed instituted a policy[16] of removing all unfavorable

---

[16] A *Monell* "policy" is not a written document. It is a term-of-art to mean "a deliberate choice to follow a course of action is made from among various

comments and banning users who make critical comments from accessing the public figure Facebook Page maintained by the City Manager. Such violates the First Amendment. *Monell* is again met.

## V.   Mootness and voluntary cessation

Freed's final argument asserts the "claims"[17] for injunctive and declaratory relief cannot be pursued against him in his personal capacity. That is untrue. Personal capacity suits only involve "personal immunity defenses"—like qualified immunity. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985). Yet, qualified immunity never precludes injunctive or declaratory relief by immunity. *Kanuszewski*, 927 F.3d at 417-418.  So why is Freed asserting injunctive and declaratory relief is not available? It is because Freed is confused.

Section 1983 authorizes both monetary and equitable liability via "an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Freed, sued in his personal capacity, has "personal liability" for actions he takes under the color of law. *Kentucky,* 473 U.S. at 165. Both types of remedies have been entered as remedies for constitutional

---

alternatives by city policymakers." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).
    [17] As a threshold issue, there are no "claims" for injunctive or declaratory relief. The claims are Section 1983 First Amendment violations. Injunctions and declaratory judgments are *forms of relief*, not "claims."

violations by local municipal officers. E.g. *Davison*, 912 F.3d at 667, 691 (affirming declaratory judgment issued against municipal official sued in her personal capacity).[18]

Freed further argues that there is "no occasion" to enter such relief because, according to his counsel, Freed has voluntarily discontinued the use of the Facebook Page. **Brief, ECF No. 23, PageID.657.** Yet Freed proffered no evidence on that assertion. In realty, the Page is merely "un-published"—meaning it lies <u>dormant</u> ready to spring back when Freed so decides. **Freed Dep., ECF No. 23-2, PageID.687-688.** In other words, Freed has temporarily deactivated, but did not completely terminated, the Page.

Voluntary cessation will only moot a case where there is "no reasonable expectation that the alleged violation will recur," and "events have *completely* and *irrevocably* eradicated the effects of the alleged violation." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019). The burden of demonstrating mootness is on Freed and it is a "heavy one."

---

[18] However, when suing a *state* official, Section 1983 is pressed against the defense of state sovereign immunity. State officials sued in his/her official capacity are only subject to prospective declaratory and injunctive relief. However—and as missed by Freed—local municipalities and their officials are not covered by state sovereign immunity and do not fall under the *Ex Parte Young* framework. *Jinks v. Richland Cnty.*, 538 U.S. 456, 466 (2003). The cases cited by Freed involve suits against *state*, not local, officials.

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

*Id.* The burden is further increased when the voluntary cessation "only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed." *Id.* at 769.

On this record, Freed has failed his burden showing complete and irrevocable eradication of the constitutional violations such that it is not "ready to be brought back to life if the need for it reoccurs." *Leonardson v. City of East Lansing*, 896 F.2d 190, 194 (6th Cir. 1990).[19]

## RELIEF REQUESTED

By March 2020, it was well established and sufficiently apparent that deleting comments and banning users from a public official's social media platform violated the First Amendment. This Court is requested to deny Freed's summary judgment motion.

Date: March 24, 2021

RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
**OUTSIDE LEGAL COUNSEL PLC**
**PHILIP L. ELLISON (P74117)**
Counsel for Plaintiff

---

[19] However, even if that were the case, it does not defeat compensatory, punitive, or nominal damages relief from these claims. *Ermold v. Davis*, 855 F.3d 715, 719 (6th Cir. 2017); *Uzuegbunam v. Preczewski*, No. 19-968, __ U.S. __ (Mar. 8, 2021) (nominal damages survive even if injunctive/declaratory relief becomes moot).

**LOCAL RULE CERTIFICATION**

I, Philip L. Ellison, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

**CERTIFICATE OF SERVICE**

I hereby certify that on date stated below, I filed the foregoing document with the ECF/CM system which will serve an email copy of the same to all counsel of record (at their email address of record) on the date stated below.

Date: March 24, 2021               RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
**OUTSIDE LEGAL COUNSEL PLC**
**PHILIP L. ELLISON (P74117)**
Counsel for Plaintiff

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

31