UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN LINDKE,

               Plaintiff,                            Case No. 20-10872

vs.                                     HON. MARK A. GOLDSMITH

JAMES R. FREED,

               Defendant.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 23)**

This matter is before the Court on Defendant James Freed's motion for summary judgment (Dkt. 23), which has been fully briefed and will be decided without oral argument.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  As discussed fully below, the Court grants the motion because Freed's actions in deleting comments by Plaintiff Kevin Lindke on Freed's Facebook page and later blocking Lindke from the page were not state action that required him to conform to constitutional strictures.

## I.      BACKGROUND

Lindke brings this action under 42 U.S.C. § 1983 against Freed, alleging that Freed violated Lindke's First Amendment rights by deleting Lindke's comments on the Facebook page that Freed operated and by blocking him from the page.  Compl. ¶¶ 52, 57 (Dkt. 1).

Since 2014, Freed has been the City Manager of Port Huron.  Freed Dep. at 9 (Dkt. 23-2). Both before and after becoming City Manager, Freed maintained a Facebook page titled "James Freed" under the username "James.R.Freed1."  Id. at 6–9; Freed Facebook Page (Dkt. 23-3).  The "About" section of Freed's Facebook page identified Freed as a "public figure."  Freed Facebook

Page.  It included a link to the City of Port Huron's website and a City email address.  Id.  It also described Freed as "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI."  Id.

Freed's Facebook posts were frequently personal in nature, in that they depicted Freed's family life.  For example, Freed regularly posted pictures of his family and their activities.  See, e.g., James.R.Freed1 Facebook Page Posts at 2, 12, 25, 80, 86, 127, 165–166, 180  (Dkt. 28-6) (featuring photos of Freed's daughter, wife, and dog).  Freed also shared updates on home-improvement projects, photos of outings with friends, and scenic photos of downtown Port Huron.  See, e.g., id. at 127, 171, 172, 192, 209.  He occasionally shared Biblical verses.  See id. at 14, 24.

In addition to these personal posts, Freed shared information about City programs, policies, and actions.  For instance, he shared information about community development initiatives.  See, e.g., id. at 79, 146, 178 (sharing information regarding installation of a new playground, reconstruction of a boat launch, and new basketball courts).

 Beginning in March 2020, Freed began to post about the COVID-19 pandemic and the City's response to it.  Most of the information that he posted originated elsewhere.  For instance, he shared COVID-19 data and press releases from St. Clair County Health Department.  See, e.g., id. at 3, 6, 31.  He also posted press releases that were distributed by the Office of the City Manager.  See id. at 22, 26 (sharing a press release on the City's use of federal funds as part of a COVID-19 relief effort and a press release regarding an executive order issued by the Governor of Michigan).

Both before and during the pandemic, Freed posted links to and offered brief commentary on news articles that reported on recent City actions.  See, e.g., id. at 7 (linking to a news story on the financial impact of the pandemic on Port Huron and the resulting furloughs of city employees); id. at 27 (linking to an article on food trucks in Port Huron); id. at 128 (linking to a news story about

the creation of the City of Port Huron Office of Diversity, Equity & Inclusion); id. at 153 (linking to an article on construction of a trail in Port Huron).

Freed is the only individual who operated the Facebook page, and he was the only one who could post to the page.  Statement of Material Facts (SOMF) ¶ 9 (Dkt. 23); Counter-SOMF ¶ 9 (Dkt. 28).  However, members of the public, including Lindke, could "like" a post or "comment" on one—as long as they were not blocked from the page.  Freed Dep. at 12.

Lindke alleges that he commented on Freed's Facebook page between four and six times from three different profiles that he operated, and that Freed deleted the comments and blocked the accounts.  Lindke Dep. at 23 (Dkt. 28-11).  Lindke testified that two of the comments he made questioned and criticized the response of Port Huron government officials, including Freed, to the COVID-19 pandemic.  Id. at 33, 35.  In response to a March 2020 post that featured a photo of Freed and the mayor of Port Huron picking up food from a restaurant, Lindke commented something to the effect of "residents are suffering" and "instead of [city leaders being] out talking to the community and being that face of the community in this," they were at an expensive restaurant.  Id. at 33.  And on one of Freed's posts about the City's response to the pandemic, Lindke commented that the response was "abysmal" and that "the [C]ity deserves better."  Id. at 35.  Lindke does not remember the precise content of his other comments, but he testified that they similarly related to his concerns about the way the City and Freed were dealing with the pandemic. Id.  In addition, four other individuals testified that Freed deleted their comments on Freed's posts that were critical of Freed or the City's actions on different issues.  DeWitt Dep. at 8–9 (Dkt. 28-

7); St. John Dep. at 8, 10 (Dkt. 28-8); Woodley Dep. at 6 (Dkt. 28-9); Pecar Dep. at 6 (Dkt. 28-10).[1]

Lindke brings this action against Freed in both his official and individual capacities, seeking declaratory and injunctive relief as well as monetary damages.  Compl. ¶ 62.  He alleges that Freed violated the First Amendment when he deleted "unfavorable or politically disadvantageous comments from the traditional public forum consisting of the Facebook [p]age" that Freed maintained (Count I).  Id. ¶ 52.  He further alleges that Freed violated the First Amendment when he "purposely and intentionally blocked . . . Lindke and several others from being able [to] communicate by 'commenting' on the traditional public forum" consisting of Freed's Facebook page solely due to their viewpoint (Count II).  Id. ¶ 57.

## II.     MOTION STANDARDS

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving

---

[1] One of these individuals resides in Port Huron.  DeWitt Dep. at 5.  One does not reside there; however, she has friends who reside there, and she visits there.  Woodley Dep. at 5.  One often works in Port Huron.  Pecar Dep. at 8.  And one has no connection to Port Huron but knows Lindke through a Facebook group that Lindke runs.  St. John Dep. at 6.

party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

### III.    ANALYSIS

Freed seeks summary judgment on several grounds, including the grounds that (i) the claims for declaratory and injunctive relief are moot, given that Freed has not used his Facebook page in nearly one year, and (ii) he was not engaged in state action when he deleted Lindke's comments and blocked Lindke from his Facebook page.  Mot. at 8–15, 24–25.

Because mootness is a threshold issue, the Court briefly discusses the justiciability of Lindke's claims before turning to the issue of state action.  As fully explained below, the Court agrees that Freed was not engaged in state action when he deleted Lindke's comments on his Facebook page and blocked Lindke from the page.  Because this finding is dispositive of Lindke's claim, the Court need not confront Freed's other arguments for summary judgment.

### A.  Justiciability

Federal courts have "no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue."  Cleveland Branch, N.A.A.C.P. v. City of Parma, 263 F.3d 513, 530 (6th Cir. 2001).  "Simply stated, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (punctuation modified).  Mootness is determined by "examining whether an actual controversy exists between the parties in light of intervening circumstances."  Fleet Aerospace Corp. v. Holderman, 848 F.2d 720, 723 (6th Cir. 1988).

In addition to seeking declaratory and injunctive relief, Lindke seeks nominal, actual, and punitive damages.  Compl. ¶ 62.  Even if Lindke's claims for declaratory and injunctive relief were moot on the theory that Freed no longer operates the Facebook page, Lindke's claim for damages

is sufficient to save the case from mootness.  See Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796 (2021) (holding that a claim for nominal damages can keep an otherwise moot case alive); Hood v. Keller, 229 F. App'x 393, 400 (6th Cir. 2007) (finding that a claim for damages was not rendered moot simply because the claims for declaratory and injunctive relief no longer presented a live controversy).  Consequently, the Court proceeds to discuss the substantive arguments in Freed's motion for summary judgment.

## B.  State Action

Section 1983 affords a plaintiff relief from constitutional violations committed by state actors. See West v. Atkins, 487 U.S. 42, 48 (1988).  To state a claim under § 1983, a plaintiff must allege that (i) he or she was deprived of a right secured by the Constitution and laws of the United States, and (ii) the deprivation was committed by a "person acting under color of state law."  Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001) (punctuation modified).[2]  Accordingly, a threshold issue is whether Freed was acting under color of state law when he deleted Lindke's comments on his Facebook page and blocked Lindke from the page.  Whether an individual acted under color of state law is a question of law for the Court's determination.  See Neuens v. City of Columbus, 303 F.3d 667, 670 (6th Cir. 2002).

### 1.  Under Color of State Law

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  West v. Atkins, 487 U.S. 42, 49 (1988) (punctuation modified).  To implicate § 1983, a state actor's conduct must "occur[] in the course

---

[2] The United States Supreme Court has explained that the analysis for § 1983's "under color of law" requirement is the same as the analysis for the Fourteenth Amendment's state-action requirement.  Lugar v. Edmondson Oil Co., 457 U.S. 922, 929 (1982).

of performing an actual or apparent duty of his office" or be such "that the actor could not have behaved as he did without the authority of his office." Waters v. City of Morristown, Tenn., 242 F.3d 353, 359 (6th Cir. 2001).

Not every action that a state actor undertakes occurs under color of state law. Id. Simply because Freed is a public official and maintains a Facebook page does not mean that his operation of the page is action taken under color of state law. Instead, the "key determinant" is whether the state actor "intends to act in an official capacity or to exercise official responsibilities pursuant to state law," or otherwise abuse the official's state-sanctioned authority. Id. When analyzing the action of a public official, "[i]t is the nature of the act performed . . . which determines whether the [official] has acted under color of law." Stengel v. Belcher, 522 F.2d 438, 441 (6th Cir. 1975).

When state officials act "in the ambit of their personal pursuits," they do not act under color of state law. Screws v. United States, 325 U.S. 91, 111 (1945). Therefore, "private conduct, outside the course or scope of [a state official's] duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." Waters, 242 F.3d at 359. Rather, the conduct allegedly causing the deprivation of a federal right must be "fairly attributable to the State." Lugar, 457 U.S. at 937.

Though the United States Court of Appeals for the Sixth Circuit has developed three tests for determining the existence of state action in a § 1983 case,[3] it has explained that all of the criteria contained in the three tests "boil down to a core question": whether "there is such a 'close nexus

---

[3] These include (i) the public function test, under which a private party is deemed a state actor if he or she exercises powers that are "traditionally exclusively reserved to the state," Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992); (ii) the state-compulsion test, under which the state can be held responsible for a private decision when it "exercise[s] such coercive power or provide[s] such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state," id.; and (iii) the substantial nexus test, Romanski v. Detroit Entertainment, LLC, 428 F.3d 629, 636 (6th Cir. 2005).

between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" Brent v. Wayne Cnty. Dep't of Human Servs., 901 F.3d 656, 676 (6th Cir. 2018) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)).  The Supreme Court has cautioned that there are no "readily applicable formulae" for finding such a close nexus.  Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961). Rather, the distinction between private and state action is a "necessarily fact-bound inquiry" that is determined on a case-by-case basis.  Lugar, 457 U.S. at 939.

While neither the Supreme Court nor the Sixth Circuit has yet analyzed the meaning of state action in the context of deleting comments from a social media page or blocking people from a social media page, the Second and Fourth Circuits, as well as several district courts, have recently addressed the issue.  See, e.g., Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226 (2d Cir. 2019); Davison v. Randall, 912 F.3d 666 (4th Cir. 2019); Charudattan v. Darnell, 510 F.Supp.3d 1101 (N.D. Fla. 2020), aff'd, 834 F. App'x 477 (11th Cir. 2020).  These opinions serve as useful guides in this case.  Thus, the Court relies on them in conducting its analysis.[4]

**2.  State Action as Applied to Operating Social Media Pages**

**a.  Factors for Assessing State Action**

When an individual claims—as Lindke does—that a public official violated the First Amendment by deleting that individual's comments from a social media page or blocking that individual from the page, public officials often contend that their social media accounts are merely personal, not governmental, in nature.  Courts have approached this argument by examining

---

[4] While the Supreme Court vacated the Second Circuit's decision in Knight and remanded the case with instructions to dismiss it as moot, the case still provides helpful guidance on the state-action issue.

whether the public official acted under color of state law in maintaining the social media account, thereby triggering First Amendment concerns.

A non-exhaustive list of factors that courts have considered in making this determination include: (i) how the public official describes and uses the page; (ii) how others, including government officials and agencies, regard and treat the page;  (iii) whether the public official is identified on the page with the public position he or she holds (such as through the title of the page or cover or profile photos); (iv) whether the public official uses the page to announce official business; (v) how the page is categorized (as either a "government official" or a "public figure"); (vi) whether the page includes governmental contact information; (vii) whether posts are expressly addressed to constituents; (viii) whether the public official solicits comments or invites constituents to have discussions on the page; (ix) whether the content posted relates to official responsibilities and business conducted in an official capacity; (x) to whom features of the page are made available; (xi) the use of government resources, including government employees, to maintain the page; (xii) whether creating the account is one of the public official's enumerated duties; (xiii) whether the account will become state property when the public official leaves office; and (xiv) whether the public official's social media activity takes place during normal working hours.  See Campbell v. Reisch, 986 F.3d 822 (8th Cir. 2021); Knight, 928 F.3d at 236; Davison, 912 F.3d at 680–681.  As discussed below, analysis of these factors leads to the conclusion that Freed was not engaged in state action in maintaining the page, or in deleting Lindke's comments and blocking Lindke from the page.

### b.  Factors as Applied to Freed's Facebook Page

In his motion for summary judgment, Freed argues that Lindke cannot establish the state action necessary to sustain his § 1983 claims because Freed operated his Facebook page as a private

citizen, not under his authority as City Manager, and there was no significant government involvement with the page.  Mot. at 9.  In response, Lindke relies on <u>Knight</u>,  in which individuals brought a § 1983 claim after former President Donald Trump blocked them from his public Twitter account because they criticized him or his policies.  The Second Circuit held that Trump acted in a governmental capacity, not as a private citizen, in blocking them.  928 F.3d at 234–236.  Lindke maintains that <u>Knight</u> is so analogous to the present case that if the Court replaced Freed for Trump and Facebook for Twitter, it would have essentially the same case.  Resp. to Mot. at 2 (Dkt. 28).  In fact, a comparison with <u>Knight</u> shows that the factors courts analyze in connection with social media accounts tip decidedly in favor of Freed.

In <u>Knight</u>, the Second Circuit determined that there was "uncontested evidence" of "substantial and pervasive government involvement with, and control over" Trump's Twitter account.  <u>Id.</u> at 235.  For instance, it noted that the public presentation of the Twitter account bore "all the trappings of an official, state-run account," as it used Trump's official title, "45th President of the United States of America," and had a header photo showing the former president engaged in official duties, such as signing executive orders, delivering remarks, and meeting with foreign dignitaries.  <u>Id.</u> at 231.  In addition, the former president and White House staff described the account as an official account for conducting official business, such as through Trump's reference to his use of the account as "modern day presidential."  <u>Id.</u> at 235.  White House staff also helped post tweets and maintain the account.  <u>Id.</u>  The court further emphasized that Trump used the account "on almost a daily basis as a channel with the public about his administration."  <u>Id.</u>  It explained that he used it to describe, defend, and "announce matters related to official government business," such as high-level staff changes, changes to major national policies, and foreign policy decisions; to assess the public's reaction to decisions or statements; and to engage with foreign

leaders.  Id. at 235–236.  Further, the White House Press Secretary described Trump's tweets as his "official statements," and the National Archives deemed them "official records" for purposes of archiving them.  Id. at 231–232.  Given that Trump "consistently used the Account as an important tool of governance and executive outreach," the court found that "the factors pointing to the public, non-private nature of the Account and its interactive features" were "overwhelming." Id. at 236.  And because Trump acted in an official capacity when he tweeted, the court concluded that he also acted in an official capacity when blocking users.  Id.

Freed's use of his Facebook page is markedly distinguishable from Trump's use of Twitter in several ways.  First, unlike Trump, who relied on paid White House staff to help maintain his account, Freed testified that he did not use any governmental employees, resources, or devices in maintaining his Facebook page.[5]  Mot. at 10; Freed Dep. at 18.

Second, unlike Trump and his White House staff, who regarded and presented the Twitter account as an official tool of executive outreach, Freed did not hold out his page as an official channel of governmental communication.  See Freed Dep. at 10.

Third, Freed testified that he neither intended his Facebook page to be an official City Manager page nor wanted an official City Manager page.  Id. at 18–19.  He stated that he operated from the presumption that the page was personal, and he would not have operated a Facebook page if he could not use it as his personal account or if he were required to allow all comments on the page. Id.  By contrast, Trump regularly used the interactive features of his account "to understand and to evaluate the public's response to what he said and did."  Knight, 928 F.3d at 236.

---

[5] Lindke claims that because Freed posted photos that others took of him, someone else must have helped him operate the page.  Resp. to Mot. at 19–20.  However, simply posting photos taken by others—as many people do on Facebook—does not establish that someone other than Freed maintained the page, or that any helper was a City employee, or that the employee was acting in that capacity while helping.

Fourth, Freed's page did not purport to be an official way of giving notice of City actions or by its nature serve to memorialize official acts. Freed's page did not claim to promulgate City policies but rather amalgamated and shared information that originated from other sources. For example, when Freed provided information from the Office of the City Manager, he did not make formal announcements through the page, but rather posted press releases that were distributed through the Office. See, e.g., James.R.Freed1 Facebook Page Posts at 22 (sharing a press release about a COVID-19 relief package). He also shared information from departments within City government and news outlets. See, e.g., id. at 3, 6, 153, 228 (sharing COVID-19 data from the St. Clair County Health Department and sharing links to news articles about efforts to make the City more bike-friendly and efforts to find taxpayer savings). These efforts at information sharing and brief commentary were hardly official acts.

In addition to Knight, Lindke invokes Davison to argue that Freed's Facebook page manifested the "trappings" of Freed's office. See Resp. to Mot. at 23. In Davison, the court held that the chair of a county board of supervisors, Randall, acted under color of state law when she blocked a constituent from her Facebook page. 912 F.3d at 681. It concluded that Randall "swath[ed]" the page "in the trappings of her office," as the page included her official title, designated her a government official, and included her county email address, her office telephone number, and a link to her county website. Id. at 680–681. Lindke urges a similar conclusion here, Resp. to Mot. at 18, pointing to the following: (i) Freed's page contained a City email address and a link to the City's website, id.; (ii) Freed used the word "we," rather than "I" in some posts about City updates, id. at 19 n.6; (iii) Freed's account was "listed as registered to City Hall (rather than Freed's home)," id. at 18; and (iv) Freed used City time to post to the page and, by extension, City resources because

12

under the City's internet policy, all data sent from or received within the City's internet system are City property, id. at 18–19.

Lindke's points are of de minimis significance. Freed's use of "we" in some posts hardly shows official trappings. The same can be said about the inclusion of a link to the City's website, as purely private individuals can include links to government websites on their pages. Lindke's other points are not supported or only negligibly so. The only evidence that Lindke points to in support of his claim that Freed posted on his Facebook page while serving and being paid as City Manager is one post that Freed made during normal business hours. 3/26/20 Facebook Post; Freed Dep. at 19. Lindke has also not demonstrated that Freed used City resources to maintain his page because he has not produced evidence showing that Freed posted to or monitored Facebook while connected to the City's internet system. And the inclusion of a City address does not indicate that the account belonged to or was "registered" to the City, or that the City had a hand in overseeing the account. Freed's page contrasts notably with City-operated Facebook pages that readily signaled their official governmental nature. For instance, the Facebook pages for the City's police department and parks and recreation department feature official titles and government emblems. See Department Pages (Dkt. 23-4).

At bottom, Lindke misses the forest for the trees in his reliance on Davison. Its conclusion about trappings of office focused far more on the functional purpose and content of the website than the visual details of the Facebook page. The court considered the content of Randall's posts, emphasizing that most were expressly addressed to her constituents, that "the content posted has a strong tendency toward matters related to [Randall]'s office," and that only "a few posts addressed topics less closely related to her official activities," such as personal matters. Davison, 912 F.3d at 674, 680–681. Randall also encouraged constituents to use the page to participate in "back and

forth conversations" about issues facing the county. Id. at 681. Accordingly, the page "principally addressed her official responsibilities." Id. at 674.

The instant case presents the reverse of the situation in Davison. The content that Freed posted had a "strong tendency" toward Freed's family life—rather than updates on City policies. See, e.g., James.R.Freed1 Facebook page Posts at 1, 201, 208–209, 224, 232–244 (featuring photos of Freed's daughter, family, dog, home-improvement projects, and social outings). This contrasts with Davison, in which only a minority of posts addressed topics unrelated to Randall's official activities. Even if Freed's official responsibilities included sharing information with City residents, his Facebook page did not "principally address[]" those responsibilities. See Davison, 912 F.3d at 674. And Freed did not invite or solicit "back-and-forth" conversations with people through the page. Freed Dep. at 12.

Other aspects of Freed's page demonstrate its overwhelming personal nature and lack of official trappings. Freed's username was not connected to his government position. See Freed Facebook Page. The title of the page did not include his official title. Id. And it was not designated as a "government official" page. Id. Moreover, the page itself would not become state property when Freed leaves office, and the record does not indicate that a city website embedded the page or displayed a link to the page. The cover photo—a still frame from a video that states, "Rediscover Downtown Port Huron"—does not reference his position as City Manager.[6] "Even if these can be trappings of an official account, they can . . . be trappings of a personal account as well." Campbell, 986 F.3d at 827; see also Charudattan, 510 F.Supp.3d at 1108–1109 (finding no

---

[6] It is disputed which profile photo was used on Freed's page at the time that he deleted Lindke's comments and blocked Lindke. Freed asserts that the photo used was one depicting himself and his family, while Lindke alleges that another photo was used, which depicted Freed at a City office with a City lapel pin. Compare SOMF ¶ 8, with Counter-SOMF ¶ 8. But neither type of photo necessarily suggests that the page represents Freed in his official capacity.

state action when a sheriff created and administered a Facebook page for a private purpose, did not include her official title on the page, did not identify herself as a government official, and did not submit posts on behalf of the sheriff's office).

As Lindke suggests, see Resp. to Mot. at 20, a social media account initially used in a private capacity can transform into an official governmental one, see Knight 928 F.3d at 231, 234.  "A private account can turn into a governmental one if it becomes an organ of official business." Campbell, 986 F.3d at 826 (holding that, even if a state representative's duties included communicating with constituents about legislation, her occasional engagement in those activities on her Twitter account was insufficient to "overshadow" the private nature of the page or turn the page into an instrument of official business).  But there is no meaningful evidence that Freed referred to or treated his page as such.

Not every action taken by a public official is state action, and "not every social media account operated by a public official is a government account." Knight, 928 F.3d at 236.  The Court finds that Freed's use of his Facebook page is distinguishable from what the court in Knight contemplated when it determined that former President Trump's use of Twitter was public.  It is far closer to the social media activities of public officials found not to be state action in Campbell and Charudattan. As Freed argues, see Mot. at 9, this case lacks "substantial and pervasive government involvement with, and control over" the social media account, given the prevailing personal quality of Freed's post, lack of formal policy pronouncements, and absence of evidence that it was a tool for official governance, Knight, 928 F.3d at 235.  In addition, under the factors outlined in Davison, Freed's management of the page cannot reasonably be treated as that of the City itself.  Freed administered his Facebook page in a private, not public, capacity. And he was

not engaged in state action when he deleted Lindke's comments and blocked Lindke from the page. As a result, his First Amendment claims fail.

## IV.     CONCLUSION

For the reasons stated above, the Court grants Freed's motion for summary judgment (Dkt. 23).

SO ORDERED.


Dated: September 27, 2021            s/Mark A. Goldsmith
Detroit, Michigan                    MARK A. GOLDSMITH
                                     United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 27, 2021.

                                     s/Jennifer McCoy
                                     Case Manager