# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: June 27, 2022

Mr. Philip Lee Ellison
Outside Legal Counsel
P.O. Box 107
Hemlock, MI 48626

Ms. Victoria Ferres
Mr. Todd J. Shoudy
Fletcher, Fealko, Shoudy & Francis
1411 Third Street, Suite F
Port Huron, MI 48060

Re:  Case No. 21-2977, *Kevin Lindke v. James Freed*
Originating Case No. : 2:20-cv-10872

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Laurie A Weitendorf
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

KEVIN LINDKE,

      *Plaintiff-Appellant*,

   *v.*

JAMES R. FREED, in his official and personal capacities,

      *Defendant-Appellee*.

No. 21-2977

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-10872—Mark A. Goldsmith, District Judge.

Argued: April 27, 2022

Decided and Filed: June 27, 2022

Before: GUY, THAPAR, and READLER, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant. Victoria R. Ferres, FLETCHER, FEALKO, SHOUDY & FRANCIS, PC, Port Huron, Michigan, for Appellee. **ON BRIEF:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant. Todd J. Shoudy, FLETCHER, FEALKO, SHOUDY & FRANCIS, PC, Port Huron, Michigan, for Appellee.

───────────────

**OPINION**

───────────────

THAPAR, Circuit Judge. James Freed prized his roles as father, husband, and city manager of Port Huron, Michigan. So his Facebook page listed all three. The question here is

whether involving his job makes Freed's Facebook activity state action. In Freed's case, it does not.

## I.

Like many Americans, James Freed joined Facebook to connect with friends and family. He created a Facebook profile—a private account limited to his "friends"—and used it for years. But eventually, he grew too popular for Facebook's 5,000-friend limit on profiles. So Freed converted his profile to a "page," which has unlimited "followers" instead of friends. His page was public, and anyone could "follow" it; for the page category, Freed chose "public figure."

In 2014, Freed was appointed city manager for Port Huron, Michigan. So he updated his Facebook page to reflect his new title. In the "About" section, he most recently described himself as "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI." R. 1-1, Pg. ID 17. Freed listed the Port Huron website as his page's website, the City's general email for "City Administration and Staff" (CommunityComments@PortHuron.org) as his page's contact information, and the City Hall address as his page's address.

Freed was an active Facebook user whose page featured a medley of posts. He shared photos of his daughter's birthday, his visits to local community events, and his family's weekend picnics. He also posted about some of the administrative directives he issued as city manager. And when the Covid-19 pandemic hit in spring 2020, he posted about that too, sharing the policies he initiated for Port Huron and news articles on public-health measures and statistics.

Freed's Covid-19 posts caught the attention of one disconcerted citizen, Kevin Lindke. Lindke didn't approve of how Freed was handling the pandemic. He saw Freed's posts about new policies and responded with criticism in the comments section. Freed didn't appreciate the comments, so he deleted them. And Freed eventually "blocked" Lindke from the page, which kept Lindke from commenting on Freed's page and its posts.

Upset that he could no longer use Facebook to engage with the city manager, Lindke sued Freed in federal court under 42 U.S.C § 1983. He argued that Freed violated his First

Amendment rights by deleting his comments and blocking him from the page. The district court granted summary judgment to Freed, and Lindke appeals.

## II.

Section 1983 provides a cause of action when federal rights are violated by someone acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. Courts have interpreted this language to mean that a defendant must be acting in a state capacity to be liable under the statute. *West v. Atkins*, 487 U.S. 42, 48 (1988). This is known as the "state action" requirement, and it turns on whether a defendant's actions are "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

How do we know if Freed was engaged in state action? One might think it's easy—Freed is a state official, after all. So we might assume everything he does is state action. But the analysis isn't that simple. When a state official acts "in the ambit of [his] personal, private pursuits," section 1983 doesn't apply. *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975). In this way, the doctrine draws a line between actions taken in an official capacity and those taken in a personal one. But the caselaw is murky as to when a state official acts personally and when he acts officially. That imprecision is made even more difficult here, since we must apply the doctrine in a novel setting: the ever-changing world of social media.

To clear the state-action waters, we analyze the current state of the doctrine and realign how state officials' actions fit into the current framework. We then explain when state officials' social-media activity constitutes state action. And lastly, we conclude Freed maintained his Facebook page in his personal capacity.[1]

---

[1]Lindke contends that the district court erred in addressing state action as a question of law; instead, he says it's a factual question that must go to a jury. But Lindke is wrong. Our court has repeatedly recognized that while the existence of state action may be fact-intensive, it is a question of law. *See, e.g.*, *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002) ("Whether [a defendant] was acting under color of law is a legal issue."); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (holding that "in certain cases" state action may be decided "as a matter of law").

## A.

The Supreme Court has identified three tests for assessing state action: (1) the public-function test, (2) the state-compulsion test, and (3) the nexus test. *Lugar*, 457 U.S. at 939; *see Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (en banc) (adopting the same). But each of these tests is framed to discern whether a *private party's* action is attributable to the state—they don't make clear the distinction between *public officials'* governmental and personal activities.

So in practice, our court has applied a different test when asking whether a public official was acting in his state capacity—which we'll call the "state-official test." *See, e.g.*, *Dean v. Byerley*, 354 F.3d 540, 552–53 (6th Cir. 2004); *Waters v. City of Morristown*, 242 F.3d 353, 359–60 (6th Cir. 2001). This test asks whether the official is "performing an actual or apparent duty of his office," or if he could not have behaved as he did "without the authority of his office." *Waters*, 242 F.3d at 359. It stems from our recognition that public officials aren't just public officials—they're individual citizens, too. And it tracks the Supreme Court's guidance as to public officials and state action. *See West*, 487 U.S. at 50 ("[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). These questions make sense in our context—they speak to whether Freed ran his Facebook page in his official or his personal capacity.

Though we haven't explained before how the state-official test fits within the Supreme Court's framework, it is simply a version of the Supreme Court's nexus test. Under the nexus test, the ultimate question is whether a defendant's action "may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). To answer that question, we analyze whether his action is "entwined with governmental policies" or subject to the government's "management or control." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)).

The state-official test mirrors these questions. Whether an official acts pursuant to his governmental duties or cloaked in the authority of his office is just another way of asking whether his actions are controlled by the government or entwined with its policies. *Compare*

*Waters*, 242 F.3d at 359–60 (applying the state-official test to a city alderman's actions), *with* *Chapman*, 319 F.3d at 834–35 (applying the nexus test to an off-duty sheriff's deputy's actions). In short, the state-official test is how we apply the nexus test when the alleged state actor is a public official.

B.

Thus, we turn to social media. When analyzing social-media activity, we look to a page or account as a whole, not each individual post. That's because to answer our cornerstone question—whether the official's act is "fairly attributable" to the state—we need more background than a single post can provide. Looking too narrowly at isolated action without reference to the context of the entire page risks losing the forest for the trees.

When does a public official run his Facebook page as an official? *See Waters*, 242 F.3d at 359. And when is a page a personal pursuit beyond section 1983's ambit? *See Stengel*, 522 F.2d at 441. Despite the new context, the answers to these questions remain rooted in the principles of our state-official test. So just like anything else a public official does, social-media activity may be state action when it (1) is part of an officeholder's "actual or apparent dut[ies]," or (2) couldn't happen in the same way "without the authority of [the] office." *Waters*, 242 F.3d at 359. Consider some examples.

Perhaps the most straightforward instance of an actual duty is when the text of state law requires an officeholder to maintain a social-media account. That is, a page can constitute state action if the law itself provides for it. So if Cincinnati decided that its residents would benefit from a public-safety Facebook page run by the police chief, it could pass a law directing the chief to operate such a page. Maintaining that page would then be one of the police chief's actual duties—and thus, state action. *See id.* This fact pattern fits neatly within the text of section 1983; the public official operates the social-media page "under color of [a state] statute, ordinance, [or] regulation." 42 U.S.C. § 1983.

The use of state resources may also indicate that running a social-media account is an official's "actual or apparent duty." *Waters*, 242 F.3d at 359. Take an example involving state funds. A city councilwoman is given a budget for community outreach efforts. She spends some

of that budget to pay for her account on a paid social-media platform, or for paid features (like ads) on a free platform. Here, her use of state funds to pay for the account suggests that operating the account is within her job duties—and thus, state action.

State action may also arise from the use of state authority. For instance, some social-media accounts belong to an office, rather than an individual officeholder. When that's true, the account is "fairly attributable" to the state because it's state property. *Lugar*, 457 U.S. at 937. After all, the public official can operate the account only because of his state authority.

For an example, imagine there's an official Facebook account for the Governor of Kentucky titled @KentuckyGovernor. The current governor, John Doe, now operates the @KentuckyGovernor page. But a few years ago, his predecessor, Jane Smith, used that handle. That's because it belongs to the governor's office, not the individual officeholder. When the office switched occupants, the @KentuckyGovernor page switched hands. Since an individual is entrusted with that page only while he's governor, it's available only under the authority of the office. And operating the page counts as state action.

By contrast, a Facebook page called @JohnDoe belongs to Doe-the-citizen—not Doe-the-governor. That page will belong to Doe even after he leaves office—it's his, not the governorship's. While the office's account is always state action, the officeholder's may not be.

A page may also draw on an officeholder's authority over government staff. Indeed, a tech-savvy governor might hire a social-media team to manage her online presence. And when those employees are on the state's payroll, using them to manage a page can transform it into state action. After all, that governor could only hire those employees on the government's dime, and direct them to operate her Facebook page, because she holds the authority of her office. And what's more, directing her employees to operate the page makes it one of the employees' job responsibilities—which further supports finding state action.

In all these instances, a public official operates a social-media account either (1) pursuant to his actual or apparent duties or (2) using his state authority. *Waters*, 242 F.3d at 359. It's only then that his social-media activity is "fairly attributable" to the state. *Lugar*, 457 U.S. at 937. Otherwise, it's personal and free from scrutiny under section 1983.

## C.

So how does this play out here?  Under these criteria, Freed's Facebook activity was not state action.  The page neither derives from the duties of his office nor depends on his state authority.  In short, Freed operated his Facebook page in his personal capacity, not his official capacity.  Walking through the examples above shows why.

First, no state law, ordinance, or regulation compelled Freed to operate his Facebook page.  In other words, it wasn't designated by law as one of the actual or apparent duties of his office.  Nor do government funds show Freed operated the page in his official capacity. Facebook is a free social-networking site; Freed pays no fees to maintain his page.  And there's no evidence he ever ran ads or any other paid content through Facebook, let alone using government funds.  Thus, there's nothing to suggest operating the page was Freed's official responsibility.

Lindke disagrees, arguing that Freed maintained the page as part of his "job duties/powers as City Manager."  Appellant Br. 29.  Though he identifies no state law or even practice tasking Freed with social-media activity, Lindke points out that Freed believes "regular communication with local businesses and residents is essential to good government."  R. 28-14, Pg. ID 1467.  And Facebook is one avenue to fulfill this "essential" task of communicating with constituents.

This argument proves too much.  When Freed visits the hardware store, chats with neighbors, or attends church services, he isn't engaged in state action merely because he's "communicating"—even if he's talking about his job.  If Port Huron's list of city-manager responsibilities mentioned operating a Facebook page to tell residents about city initiatives, that might be a different story.  But Freed's own off-handed reference to "regular communication" can't render *every* communication state action.

Next, Freed's page did not belong to the office of city manager.  Freed created the page years before taking office, and there's no indication his successor would take it over.  Indeed, it would make little sense for the new city manager to take over a page titled "@JamesRFreed1." Lindke says little to contest this, noting only that if Freed takes a job with another city, his page's

Port Huron connections "would be of no value" in that new role. Appellant Br. 39. So, he speculates, Freed might give the page to his replacement. But if, as Freed contends, his Facebook page was personal, the "value" of his Facebook ties bears little relation to his job title. And regardless, Freed created his page before he took office. It belonged to him before he was city manager, and we have no reason to believe it will change hands if he leaves his post. So this avenue for state action doesn't apply.

Nor does Freed rely on government employees to maintain his Facebook page. Freed is the page's only administrator—none of his staff have access to it. And there's no evidence that staffers were involved in preparing content for Freed to use on the page, or that staff ever posted on Freed's behalf. Lindke argues that some photos Freed posted "would be impossible for Freed to have done himself," and thus concludes that government employees must be taking his photos. *Id.* at 25. But even if that's true, such minimal involvement isn't enough to transform a personal page into an official one. It could be different if Freed's employees designed graphics specifically for the page and no other use. But snapping a few candids at a press conference is routine—not a service Freed accesses by the "authority of his office." *Waters*, 242 F.3d at 259. Indeed, his staff would likely do this even if Freed didn't have a Facebook page. Plus, even if staff took photos at Freed's direction, that would be de minimis help—not enough to render the page state action. So staff support can't prop up Lindke's claim, either.

Lindke presents no other reason Freed's Facebook activity relates to his job duties or depends on his state authority. Instead, he argues that we should find state action where "the presentation of the account is connected with the official's position." Appellant Br. 35. And understandably so—several other courts have used that approach, focusing on a social-media page's purpose and appearance. *See, e.g.*, *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 234–36 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1220–21 (2021); *Davison v. Randall*, 912 F.3d 666, 680–81 (4th Cir. 2019); *Campbell v. Reisch*, 986 F.3d 822, 826–27 (8th Cir. 2021); *Charudattan v. Darnell*, 834 F. App'x 477, 482 (11th Cir. 2020) (per curiam).

Drawing on those opinions, especially the Second Circuit's analysis in *Knight First Amendment Institute v. Trump*, Lindke claims that Freed used the "trappings of an official, state-

run account" to give the impression that the page operated under the state's imprimatur. 928 F.3d at 231. *But see Knight First Amend. Inst. v. Trump*, 953 F.3d 216, 226 (2d Cir. 2020) (Park, J., dissenting from denial of rehearing en banc).

In support of this argument, Lindke points to Freed's use of a city address, email, and website on the Facebook page, along with a profile photo featuring Freed wearing his city-manager pin and his frequent use of "we" and "us." But these "trappings" weren't the only facts the Second Circuit relied on in *Knight*. Indeed, that opinion emphasized the "substantial and pervasive government involvement with, and control over," President Trump's Twitter account. *Knight*, 928 F.3d at 235. No official account directs users to Freed's page, as the White House's Twitter account did in that case. *Id.* And as discussed above, there's no evidence Freed used government employees to maintain the account, as President Trump did there. *Id.* So even on *Knight*'s terms, the presentation-based factors Lindke identifies might not be enough.

Nonetheless, the factors Lindke points to resemble the factors we consider in assessing when police officers are engaged in state action. That is, Lindke's focus on the page's appearance seems akin to considering whether an officer is on duty, wears his uniform, displays his badge, identifies himself as an officer, or attempts to arrest anyone. *See Kalvitz v. City of Cleveland*, 763 F. App'x 490, 496 (6th Cir. 2019).

But the resemblance is shallow. In police-officer cases, we look to officers' appearance because their *appearance* actually evokes state authority. *Cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (finding state action when a defendant exercises a "right or privilege created by the State" (citation omitted)). We're generally taught to stop for police, to listen to police, to provide information police request. And in many cases, an officer couldn't take certain action without the authority of his office—authority he exudes when he wears his uniform, displays his badge, or informs a passerby that he is an officer. So in those cases, appearance is relevant to the question whether an officer could have acted as he did without the "authority of his office." *Waters*, 242 F.3d at 359. Here, by contrast, Freed gains no authority by presenting himself as city manager on Facebook. His posts do not carry the force of law simply because the page says it belongs to a person who's a public official.

That's why we part ways with other circuits' approach to state action in this novel circumstance. Instead of examining a page's appearance or purpose, we focus on the actor's official duties and use of government resources or state employees. As explained above, these anchors are rooted in our circuit's precedent on state action. And they offer predictable application for state officials and district courts alike, bringing the clarity of bright lines to a real-world context that's often blurry.

But our state-action anchors are missing here. Freed did not operate his page to fulfill any actual or apparent duty of his office. And he didn't use his governmental authority to maintain it. Thus, he was acting in his personal capacity—and there was no state action.

*        *        *

James Freed didn't transform his personal Facebook page into official action by posting about his job. Instead, his page remains personal—and can't give rise to section 1983 liability. We affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-2977

KEVIN LINDKE,

     Plaintiff - Appellant,

     v.

JAMES R. FREED, in his official and personal capacities,

     Defendant - Appellee.

**FILED**
Jun 27, 2022
DEBORAH S. HUNT, Clerk

Before:  GUY, THAPAR, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk