**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHRISTOPHER GARNIER; KIMBERLY GARNIER, | Nos.   21-55118<br>21-55157 |
| *Plaintiffs-Appellees / Cross-Appellants*, | D.C. No.<br>3:17-cv-02215-<br>BEN-JLB |
| v. | |
| MICHELLE O'CONNOR-RATCLIFF; T.J. ZANE, | OPINION |
| *Defendants-Appellants / Cross-Appellees*. | |

On Remand from the United States Supreme Court

Argued and Submitted January 17, 2025
Pasadena, California

Filed May 14, 2025

Before: Marsha S. Berzon, Richard C. Tallman, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## First Amendment/Social Media

On remand from the United States Supreme Court in an action brought by parents of children attending Poway Unified School District ("PUSD") against two members of the PUSD's Board of Trustees alleging First Amendment violations, the panel affirmed the district court's bench trial judgment against defendant Michelle O'Connor-Ratcliff and remanded with instructions to dismiss as moot defendant T.J. Zane from the case.

Defendants O'Connor-Ratcliff and Zane used their public Facebook and Twitter pages to post about goings-on at PUSD and their activities as Trustees. In response to plaintiffs' numerous critical and often repetitive comments on defendants' social media pages, defendants deleted or hid plaintiffs' comments and later blocked them from the accounts. Plaintiffs brought suit pursuant to 42 U.S.C. § 1983, alleging First Amendment violations. The district court granted judgment for the plaintiffs and this court affirmed. The Supreme Court subsequently vacated this court's opinion and remanded for reconsideration in light of the standard articulated in *Lindke v. Freed*, 601 U.S. 187 (2024), for determining when a public official's social media activity constitutes state action.

Under *Lindke*, a public official's social media activity constitutes state action for purposes of § 1983 "only if the official (1) possess[es] actual authority to speak on the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

State's behalf, and (2) purport[s] to exercise that authority when he [speaks] on social media." *Id.* at 198.  Applying this standard, the panel held that O'Connor-Ratcliff acted under color of state law in blocking plaintiffs from her social media pages.  First, California law and PUSD Board of Education bylaws established that O'Connor-Ratcliff possessed actual authority to speak on the State's behalf. Second, the appearance and function of O'Connor-Ratcliff's social media pages confirmed that she purported to exercise that authority when she spoke on social media.  For that reason—as well as those articulated in the court's earlier opinion and not challenged in the Supreme Court—the panel affirmed the district court's judgment as to O'Connor-Ratcliff.

Because defendant Zane was no longer a member of the Board and the parties stated at oral argument that the case was moot as to Zane, the panel remanded the claim against Zane to the district court with instructions to dismiss him from the case.

---

## COUNSEL

Cory J. Briggs (argued), Briggs Law Corporation, Upland, California, for Plaintiffs-Appellees.

Daniel R. Shinoff (argued), Jack M. Sleeth Jr., and Paul V. Carelli IV, Artiano Shinoff, San Diego, California, for Defendants-Appellants.

Katherine Fallow and Stephanie Krent, Knight First Amendment Institute at Columbia University, New York, New York; David Greene and Sophia Cope, Electronic

Frontier Foundation, San Francisco, California; for Amici Curiae Electronic Frontier Foundation and Knight First Amendment Institute at Columbia University.

---

**OPINION**

BERZON, Circuit Judge:

Christopher and Kimberly Garnier brought this 42 U.S.C. § 1983 suit challenging the actions of Michelle O'Connor-Ratcliff and T.J. Zane, members of the Poway Unified School District ("PUSD" or "the District") Board of Trustees. O'Connor-Ratcliff and Zane (collectively referred to as "the Trustees") used their public Facebook and Twitter pages to post about goings-on at PUSD and their activities as Trustees. In response to the Garniers' numerous critical and often repetitive comments on the Trustees' social media pages, the Trustees deleted or hid the Garniers' comments. Later, the Trustees began blocking the Garniers from interacting on their social media accounts altogether. The Garniers brought suit under § 1983, alleging that the Trustees' actions violated the Garniers' First Amendment rights. Following a bench trial, the district court agreed with the Garniers and awarded them declaratory and injunctive relief. We affirmed that judgment, and the Trustees appealed to the Supreme Court.

This case returns to our court following vacatur and remand by the Supreme Court. *See O'Connor-Ratcliff v. Garnier*, 601 U.S. 205, 208 (2024) (per curiam). In a related case—*Lindke v. Freed*, 601 U.S. 187 (2024)—the Supreme Court held that a public official's social media activity

constitutes state action for purposes of § 1983 "only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." 601 U.S. at 198. The Court vacated our previous judgment in this case because we had applied a different standard than that articulated in *Lindke* to answer whether the Trustees acted under color of state law. *O'Connor-Ratcliff*, 601 U.S. at 208.

The substantive issue before us on remand is whether, applying the standard set out in *Lindke*, the Trustees acted under color of state law. We hold that O'Connor-Ratcliff did, and that the case against Zane is moot.

## I.  BACKGROUND

We provided a full discussion of the facts of this dispute in our earlier decision. *See Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1163–67 (9th Cir. 2022). Here is a summary:

The plaintiffs—Christopher and Kimberly Garnier—are parents of children who attend school in the Poway Unified School District. The defendants—Trustees O'Connor-Ratcliff and Zane—are or, in the case of Zane, were members of the PUSD Board of Trustees. Beginning during their 2014 campaigns for election to the Board and continuing through their time as Board members, the Trustees maintained public social media pages on Facebook and the site then known as Twitter. On those pages, the Trustees informed constituents about activities at PUSD schools and actions of the Board, invited the public to attend Board meetings, and solicited input about Board decisions.

Starting sometime in 2015, the Garniers, dissatisfied with the governance of PUSD schools, began frequently posting comments critical of the Trustees and the Board on

the Trustees' social media pages. The Garniers sometimes posted the same critical messages to the Trustees' pages repeatedly. For a time, the Trustees deleted or hid the Garniers' comments. But around October 2017, the Trustees decided enough was enough. O'Connor-Ratcliff blocked both Garniers from her Facebook page and blocked Christopher Garnier from her Twitter page. Zane blocked the Garniers from his Facebook page.

Displeased with being blocked, the Garniers filed a 42 U.S.C. § 1983 action against the Trustees and the District, seeking damages as well as declaratory and injunctive relief.**[1]** As relevant here, the Garniers alleged that the Trustees' social media pages constituted public fora and that, by blocking them, the Trustees violated the Garniers' First Amendment rights.

At summary judgment, the district court granted the Trustees qualified immunity as to the Garniers' damages claims. The district court also found that the Trustees acted under color of state law for purposes of § 1983 and that their social media pages were designated public fora. A two-day bench trial followed, after which the district court determined that the Trustees' decision to block the Garniers was content neutral and that, although the Trustees' initial decision to block the Garniers was narrowly tailored to the goal of avoiding repetitive comments on the Trustees' pages, indefinitely blocking them was not. The district court therefore found in favor of the Garniers on their § 1983 claim and entered an injunction ordering the Trustees to unblock the Garniers from their Facebook and Twitter pages.

---

[1] Following the District's filing of a motion to dismiss, the Garniers voluntarily dismissed the District from the case.

The Trustees appealed the district court's judgment. The Garniers cross-appealed, arguing that the district court erred in granting qualified immunity to the Trustees as to the Garniers' damages claims. In our earlier opinion, we affirmed the judgment of the district court. *Garnier*, 41 F.4th at 1185. We held that the Trustees acted under color of state law and violated the First Amendment in blocking the Garniers. *Id.* at 1173, 1183. We also affirmed the district court's qualified immunity determination. *Id.* at 1184.

The Trustees appealed our state action determination to the Supreme Court. After granting the Trustees' petition for a writ of certiorari and holding oral argument, the Supreme Court decided *Lindke*, in which the Court announced a new standard for determining when a public official's social media activity constitutes state action. 601 U.S. at 198. The same day it issued the opinion in *Lindke*, the Court vacated our earlier decision and remanded for proceedings consistent with *Lindke*. *O'Connor-Ratcliff*, 601 U.S. at 208; *see Lindke*, 601 U.S. 187. We ordered the parties to submit supplemental briefing on the effect of *Lindke* on this case and heard additional oral argument.

## II. DISCUSSION

Given the complex procedural history of this case, it is worth explaining at the outset what is and is not at stake here. The Trustees sought and were granted a writ of certiorari regarding only our determination that they "engage[d] in state action subject to the First Amendment." Petition for Writ of Certiorari at i, *O'Connor-Ratcliff*, 601 U.S. 205 (No. 22-324). The Supreme Court vacated our earlier decision because our state action analysis differed from that adopted in *Lindke* and remanded for application of the *Lindke* standard. *O'Connor-Ratcliff*, 601 U.S. at 208.

Our earlier holding that the Trustees are entitled to qualified immunity on the Garniers' damages claim, which the Garniers did not appeal, remains in effect.[2]  *See Garnier*, 41 F.4th at 1183–84.  Our holding that the Trustees violated the First Amendment when they blocked the Garniers from their social media pages is implicated only to the extent that a determination that the Trustees did not act under color of state law would mean that they could not have violated the First Amendment.  *See, e.g.*, *Prager Univ. v. Google LLC*, 951 F.3d 991, 997–99 (9th Cir. 2020).  So if we conclude (as we do, *see infra* at 21–22) that there was state action, our earlier substantive First Amendment holdings—that the social media accounts constituted public fora and that the decision to block the Garniers was not sufficiently tailored to a significant government interest—also remain binding. *See Garnier*, 41 F.4th at 1177–83.

## A. Mootness

One relevant fact has changed since our earlier decision: Zane is no longer a member of the Board following the end of his term in December 2022.  Both parties stated at oral argument that the case is therefore moot as to Zane.  Oral Argument at 7:56, 28:19, *Garnier v. O'Connor-Ratcliff*, No. 21-55118          (Jan.          17,          2025), https://www.youtube.com/watch?v=nsSM0bXCCRM.  We agree.

The basis of the Garniers' § 1983 claim and of the controversy between the parties was the Trustees' status as public officials.  Zane's departure from public office means

---

[2] The same is true for our holding that we lack jurisdiction to address the Trustees' contention that the district court erred by denying without prejudice their motion to retax costs.  *See Garnier*, 41 F.4th at 1184–85.

that he no longer has that status and therefore is not a state actor in any respect.  Nor is there any indication that Zane intends to seek public office again.  The Garniers' claim against him has therefore "los[t] its character as a present, live controversy." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 559 (9th Cir. 2009) (quoting *Earth Island Inst. v. U. S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006)).  We remand the claim against Zane to the district court with instructions to dismiss the claim as moot.

## B.  State Action Under *Lindke*

In our earlier opinion we applied the "nexus test" articulated in *Naffe v. Frey*, 789 F.3d 1030, 1036–38 (9th Cir. 2015), to determine whether the Trustees' use of their social media pages qualified as state action under the Fourteenth Amendment and so constituted action "under color of state law" for purposes of § 1983.[3]  *See Garnier*, 41 F.4th at 1170–73.  We held that the Trustees acted under color of state law because: (1) "the Trustees 'purport[ed] . . . to act in the performance of [their] official duties' through the use of their social media pages," (2) "the Trustees' presentation of their social media pages as official outlets facilitating their performance of their PUSD Board responsibilities 'had the purpose and effect of influencing the behavior of others,'" and (3) "the Trustees' management of their social media pages 'related in some meaningful way' to their 'governmental status' and 'to the performance of [their] duties.'"  *Id.* at 1171 (alterations in original) (first

---

[3] Because § 1983's "under color of state law" requirement "tracks [the 'state action' requirement] of the Fourteenth Amendment," *Lindke*, 601 U.S. at 194, we use those phrases interchangeably in this opinion.

quoting *Anderson v. Warner*, 451 F.3d 1063, 1069 (9th Cir. 2006); and then quoting *Naffe*, 789 F.3d at 1037).

After granting certiorari in both this case and *Lindke v. Freed*, 37 F.4th 1199 (6th Cir. 2022), the Supreme Court in *Lindke* announced a new test for determining whether a public official's social media activity constitutes action under color of state law for purposes § 1983. *Lindke* held that "a public official's social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." 601 U.S. at 198. The Court remanded this case for reconsideration in light of the standard articulated in *Lindke*. *O'Connor-Ratcliff*, 601 U.S. at 208.

Considering O'Connor-Ratcliff's social media activity in light of *Lindke*'s two steps, we hold that O'Connor-Ratcliff acted under color of state law in blocking the Garniers from her social media pages. First, California law and PUSD Board of Education bylaws establish that O'Connor-Ratcliff "possessed actual authority to speak on the State's behalf." *See id.* at 198. Second, the appearance and function of O'Connor-Ratcliff's social media pages confirm that she "purported to exercise that authority when [she] spoke on social media." *Id.*

### 1. *Lindke* Step One

Regarding the first *Lindke* step, the Court explained that it is not sufficient that an official presents herself as possessing authority to speak on behalf of the state or appears to the public to do so. *Lindke*, 601 U.S. at 199. Instead, a public official's social media activity is "attributable to the State" only if the official is "possessed of state authority" to speak on the state's behalf. *Id.* (quoting

*Griffin v. Maryland*, 378 U.S. 130, 135 (1964)). Additionally, "[t]he alleged censorship" challenged as unconstitutional "must be connected to speech on a matter within [the official's] bailiwick." *Id.*

*Lindke* instructed that, to determine whether a public official possesses authority to speak on behalf of the state, courts are to look to the sources listed in § 1983: "statute, ordinance, regulation, custom, or usage." *Id.* at 200. The first three sources refer to written law, whereas the latter two include "'persistent practices of state officials' that are 'so permanent and well settled' that they carry 'the force of law.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). An official need only have authority to speak for the state generally, not on social media specifically. *Id.* Additionally, although the Court cautioned against reliance on "excessively broad job descriptions," the Court recognized that state law may grant officials "broad responsibility" over an area "that, in context, includes authority to make official announcements on that subject." *Id.* at 201 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022)).

Consistent with *Lindke* and the text of § 1983, we begin our analysis of O'Connor-Ratcliff's authority to speak on behalf of the state by examining the relevant "statute[s], ordinance[s], regulation[s], custom[s], or usage[s]." *Id.* at 200. California law empowers school boards to "[i]nform and make known to the citizens of the district, the educational programs and activities of the schools therein." Cal. Educ. Code § 35172(c). PUSD Board bylaws describe the role of individual board members in communicating such information to the public. The bylaws "recognize[] that electronic communication is an efficient and convenient way for Board members to communicate and expedite the

exchange of information within the district and with members of the public." *Board Member Electronic Communications*, Board Bylaw 9012(a), Poway Unified Sch. Dist. (adopted Aug. 9, 2018).**[4]**  The bylaws also provide "[e]xamples of permissible electronic communications concerning district business," including, but not limited to, "dissemination of Board meeting agendas and agenda packets, reports of activities from the Superintendent, and reminders regarding meeting times, dates, and places." *Id.* The bylaws also designate the Board president as one of the Board's representatives who can communicate public statements from the Board "regarding district issues" to community members. *Public Statements*, Board Bylaw 9010(a), Poway Unified Sch. Dist. (adopted Aug. 9, 2018). O'Connor-Ratcliff was serving as the Board president when she blocked the Garniers from her social media pages.

The bylaws confirm O'Connor-Ratcliff's authority to speak on behalf of the District.  Bylaws—written regulations approved by the Board—are legitimate sources of authority under *Lindke*. *See Lindke*, 601 U.S. at 200; *Board Policies*, Board Bylaw 9310(b), Poway Unified Sch. Dist. (adopted Aug. 9, 2018).  Bylaw 9012's recognition of the importance of Board members' communicating with the public demonstrates that speaking to constituents was "part of the job that the State entrusted [O'Connor-Ratcliff] to do."

---

[4] The currently available versions of the bylaws were amended in 2018, some months after O'Connor-Ratcliff blocked the Garniers on social media.  The parties have jointly stipulated that the versions of the applicable bylaws operative at the time O'Connor-Ratcliff made the posts considered here and blocked the Garniers were substantially the same as the 2018 versions.  We therefore rely on the 2018 bylaws as establishing the Board provisions controlling at the time of O'Connor-Ratcliff's challenged actions.

*Lindke*, 601 U.S. at 201.   At a minimum, Bylaw 9012 establishes that PUSD Board members are authorized to communicate certain official, sanctioned information and materials authored by the Board or the Superintendent, while Bylaw 9010(a) indicates that O'Connor-Ratcliff, as the Board president, is a person authorized to share information with the community.   Many of O'Connor-Ratcliff's social media posts included "permissible" content under Bylaw 9012, including posts alerting the public to Board meeting times and agenda items.   Further, there can be no question that posts concerning official Board activities were within O'Connor-Ratcliff's "bailiwick" as a member of the Board and Board president.   *See id.* at 199.   O'Connor-Ratcliff therefore possessed actual authority to speak on behalf of the state.

O'Connor-Ratcliff makes several arguments for why she lacks authority to speak for the District.   First, she maintains that school board members do not possess individual authority to speak on behalf of the state because California law limits official acts of school boards to those approved by a majority vote at a properly scheduled school meeting.   We rejected a similar argument in our earlier decision.   *See Garnier*, 41 F.4th at 1173.   Although *Lindke* announced a new standard for state action in cases concerning social media activity, O'Connor-Ratcliff's argument on this point remains unconvincing.   As we explained in our previous opinion, "the duties of elected representatives extend beyond 'participating in debates and voting.'"   *Id.* (quoting *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995)).   Furthermore, *Lindke* instructs that the crucial inquiry is "whether making official announcements is *actually* part of the job that the State entrusted the official to do."   601 U.S. at 201.     Because the Board bylaws demonstrate that

O'Connor-Ratcliff's authority "in context, include[d] authority to make official announcements" regarding PUSD Board of Education activities, *Lindke*'s first step is satisfied. *Id.*

Second, O'Connor-Ratcliff points to a PUSD administrative regulation concerning "district-sponsored social media" as establishing that she did not have authority to speak on behalf of the state. That regulation defines an "[o]fficial district social media platform" as "a site authorized by the Superintendent or designee" and states that "[s]ites that have not been authorized by the Superintendent or designee . . . are not considered official district social media platforms." *District-Sponsored Social Media*, Administrative Regulation 1114(a), Poway Unified Sch. Dist. (approved Oct. 12, 2017).

There is no evidence that O'Connor-Ratcliff's social media pages were so authorized. But that does not mean that O'Connor-Ratcliff lacked authority to speak on behalf of the District. The focus at *Lindke*'s first step is on the authority of the individual official, not the official character of the social media account through which they speak; *Lindke* recognized the possibility that public officials may at times make official announcements on unofficial, and even otherwise exclusively personal, social media accounts. *See* 601 U.S. at 202–03, 202 n.2. So O'Connor-Ratcliff's exercise of her authority to speak on behalf of the District can constitute state action even if it happened on social media pages that are not "official district social media platforms" as defined by PUSD. *District-Sponsored Social Media*, Administrative Regulation 1114(a), Poway Unified Sch. Dist. (adopted Oct. 12, 2017).

Lastly, O'Connor-Ratcliff argues that she lacked authority to speak on behalf of the state because she created her social media pages as campaign sites before taking office and the District never "convert[ed]" them to official channels of communication. That argument fails for similar reasons to those that undermine the relevance of her observation that her social media pages were not authorized by the District. *Lindke*'s concern with actual authority is satisfied by the fact that the District authorized O'Connor-Ratcliff to speak on its behalf. There is no requirement that for an official's use of her social media pages to constitute state action, the state must sanction or control those pages. In fact, an official's authority to speak on behalf of the state may extend to social media even where the relevant state or local law does not contemplate social media at all. *Lindke*, 601 U.S. at 200. To the extent that O'Connor-Ratcliff's social media pages maintained the "appearance and function" of campaign pages after her election, that fact is relevant to the second step of *Lindke*, not the first. *See id.* at 198.

In sum, PUSD Board bylaws establish that O'Connor-Ratcliff possessed actual authority to speak on behalf of the state, satisfying *Lindke*'s first prong.

### 2. *Lindke* Step Two

*Lindke*'s second step hinges on whether a public official "use[s] his speech in furtherance of his official responsibilities" or "invoke[s] his official authority" when speaking on social media. *Id.* at 201–02. Relevant to this determination is the "appearance and function" of a public official's social media activity. *Id.* at 198.

The Court in *Lindke* offered a useful "hypothetical from the offline world" to help identify when an official purports to speak on behalf of the state:

> A school board president announces at a school board meeting that the board has lifted pandemic-era restrictions on public schools. The next evening, at a backyard barbecue with friends whose children attend public schools, he shares that the board has lifted the pandemic-era restrictions. The former is state action taken in his official capacity as school board president; the latter is private action taken in his personal capacity as a friend and neighbor. While the substance of the announcement is the same, the context— an official meeting versus a private event— differs. He invoked his official authority only when he acted as school board president.

601 U.S. at 201–02.

Translating this physical-world hypothetical to the world of social media, *Lindke* explained that some social media accounts are like the barbecue: where an account carries a label that it is a personal account or a disclaimer identifying the page's content as reflecting only the official's personal views, a public official is "entitled to a heavy (though not irrebuttable) presumption that all of the posts on [that] page were personal." *Id.* at 202. On the other hand, some accounts function like the school meeting. For example, where an account "belongs to a political subdivision . . . or is passed down to whomever occupies a particular office," it may be "clear that a social-media account purports to speak

for the government." *Id.* at 202.   Where an account is personal or official then, *Lindke*'s second step can generally be answered at the account level. *See id.*

In contrast, where an account is "mixed use"—meaning the account includes posts made in both a personal and official capacity—courts may need to engage in a further inquiry to determine whether specific posts' "content and function" indicate that the official was exercising their authority to speak on behalf of the state. *Id.* at 202–03. Indicators that an official is exercising official authority in a post include, but are not limited to, the explicit invocation of state authority, a post's legal effect, the fact that a post shares official information not otherwise publicly available, and the use of government staff to make a post. *Id.* at 203.

*Lindke* further explained that for mixed-use accounts, the specific action taken by the official can affect the analysis. If an official deletes comments from a post or posts, the "only relevant posts" for state action purposes "are those from which [the plaintiff's] comments were removed," so a post-by-post analysis is required. *Id.* at 204.   On the other hand, if an official blocks an individual from a page altogether, then the existence of any post made in an official capacity on which the individual wished to comment would render the blocking state action. *Id.*

Overall, then, *Lindke*'s second step asks whether a public official "purported to exercise" their "authority to speak on the State's behalf" when they "spoke on social media." 601 U.S. at 198.   Although decided before the Supreme Court articulated the *Lindke* standard, our previous opinion conducted a nearly identical inquiry.   We held that the Trustees, including O'Connor-Ratcliff, "'purport[ed] . . . to act in the performance of [their] official duties' through the

use of their social media pages." *Garnier*, 41 F.4th at 1171
(alterations in original) (quoting *Anderson*, 451 F.3d at
1069).    Considering O'Connor-Ratcliff's social media
activity again in light of the guidance provided by *Lindke*,
we reaffirm our earlier holding that she purported to act
pursuant to her official authority when she spoke on social
media for the following reasons.

Under *Lindke*, the first question is what category
O'Connor-Ratcliff's accounts fall into: are they personal,
official, or somewhere in between?    Based on their
appearance and content, O'Connor-Ratcliff's Facebook and
Twitter accounts most closely resemble official accounts.
*See id.* at 198, 201–02. Although the accounts bore her name
rather than that of the PUSD Board or her office, O'Connor-
Ratcliff identified herself on both pages as the president of
the PUSD Board of Education.   That title appeared in the
"About" section of O'Connor-Ratcliff's Facebook page and
directly under her name on her Twitter page, making it
immediately visible to anyone who visited her Twitter
account.  On Facebook, O'Connor-Ratcliff also identified
herself as a "Government Official" at the top of her "Home"
page and provided her official PUSD email address as a
means of contact.   Further, neither account included a
disclaimer that the pages or posts were intended to be
personal.  In fact, O'Connor-Ratcliff maintained a separate,
private Facebook account for engaging with her family and
friends in her personal capacity—a digital "barbecue" where
she spoke as a relative, friend, and neighbor.  In all, then, the
presentation of the social media accounts from which the
Garniers were blocked signaled that they were clothed in the
authority of O'Connor-Ratcliff's office.

The content of O'Connor-Ratcliff's social media pages
confirms their official nature.   As we observed in our

previous opinion, O'Connor-Ratcliff's posts were "overwhelmingly geared toward 'provid[ing] information to the public about' the PUSD Board's 'official activities and solicit[ing] input from the public on policy issues' relevant to Board decisions." *Garnier*, 41 F.4th at 1171 (alterations in original) (quoting *Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019)). Screenshots of O'Connor-Ratcliff's Facebook and Twitter feeds show them to be almost exclusively dedicated to posts about PUSD schools and Board of Education activities. Further, as we stated in our earlier opinion, O'Connor-Ratcliff's posts did not "advertis[e] 'campaign promises' kept or tout[] [her] own political achievements" but instead "concerned official District business or promoted the District generally." *Id.* at 1172. Accordingly, after her election to the PUSD Board, O'Connor-Ratcliff maintained the social media pages here at issue not in her personal capacity or as a political candidate but as a PUSD official.

O'Connor-Ratcliff's labelling and use of her social media pages distinguishes them not only from personal accounts but also from mixed-use accounts, like that at issue in *Lindke*. In the same "About" section in which O'Connor-Ratcliff described herself as "Board of Education, President, Poway Unified School District," the Facebook page in *Lindke* included the description "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the Citizens of Port Huron, MI." *Lindke*, 601 U.S. at 192. The difference between the two self-descriptions—one strictly official, the other a mix of personal and official—is replicated in the content of the pages. Whereas O'Connor-Ratcliff used her pages to post almost exclusively about PUSD activities and Board announcements, the official in

*Lindke* posted "prolifically (and primarily) about his personal life." *Id.* at 192, 202.

Even if we were to consider O'Connor-Ratcliff's pages to be "mixed use," *Lindke*'s second step would be satisfied. When considering posts on a mixed-use page, we look to each post's "content and function" to determine whether it was made in an official capacity. *Id.* at 203.   Pertinent factors to that determination include whether the relevant post invokes state authority, has immediate legal effect, contains information not available elsewhere, or was posted using government staff or resources.   *Id.*   The ultimate inquiry here is whether O'Connor-Ratcliff "purport[ed] to exercise the power of [her] office" via posting on social media.   *Id.*   Because the Garniers' only remaining claim concerns O'Connor-Ratcliff's page-wide blocking of them from her social media accounts, *Lindke* requires that O'Connor-Ratcliff purported to exercise her official authority with respect to only a single post on those accounts on which the Garniers wished to comment but could not do so.   *See id*. at 204.   That requirement is met here.

Two related posts from O'Connor-Ratcliff's Facebook page show how she used her social media accounts to make official statements.   In July 2016, O'Connor-Ratcliff used her Facebook page to announce the Board's decision to terminate the employment of the PUSD superintendent.   In February 2017, O'Connor-Ratcliff posted on her Facebook page to announce the Board's selection of a new superintendent.   In that post, she invited the public to "join the Board in welcoming [the superintendent] into [the PUSD] community."   There is no evidence that either post was made using PUSD staff or resources.   But consideration of *Lindke*'s other factors confirms the posts' official character.   The first announcement preceded the statement

on the superintendent's firing published by the District and
thus alerted the public to information that was not otherwise
available. *See id.* at 203. The second post was an official
announcement involving the invocation of O'Connor-
Ratcliff's position. *See id.* Both posts "ma[de] clear" that
O'Connor-Ratcliff was "purporting to discharge an official
duty." *See id.* Furthermore, posts concerning the status of
the superintendent were just the sort of posts on which the
Garniers wished to comment. *See id.* at 204. Before being
blocked from O'Connor-Ratcliff's pages, the Garniers
frequently complained about and called for the resignation
of the superintendent whose firing and replacement
O'Connor-Ratcliff announced.

O'Connor-Ratcliff used social media to carry out the
duties of her office in other posts as well. Consistent with
the "permissible electronic communications concerning
district business" listed in the bylaws, O'Connor-Ratcliff
regularly posted Board meeting dates, times, and agenda
packets on both Facebook and Twitter. In other posts, she
invited constituents to complete surveys related to district
budgetary planning and the superintendent hiring process.

Of course, "an official does not necessarily purport to
exercise [her] authority simply by posting about a matter"
within that authority. *Id.* at 203. But O'Connor-Ratcliff's
posts here not only included announcements that she was
explicitly empowered to make but also appeared on pages
labelled as belonging to an official member of the PUSD
Board. Because O'Connor-Ratcliff designated her social
media pages as official in both appearance and function,
*Lindke*'s second step is satisfied: O'Connor-Ratcliff
purported to exercise her authority to speak on behalf of the
state when she posted on social media. She therefore acted

under color of state law when she blocked the Garniers from
her social media accounts.

We emphasize that public officials assuredly do have the
right to speak on public affairs, including issues related to
their official duties, in their personal capacity.   As the
Supreme Court advised in *Lindke*, public officials can limit
the risk of liability for personal speech on social media by,
for instance, "keep[ing] personal posts in a clearly
designated personal account," including a disclaimer, or
refraining from labelling their personal pages as official
means of communication.  *Id.* at 202–04.

## CONCLUSION

We hold that O'Connor-Ratcliff's blocking of the
Garniers on her social media accounts constituted state
action under *Lindke*.   For that reason—as well as those
articulated in our earlier opinion and not challenged in the
Supreme Court—we affirm the judgment of the district court
as to O'Connor-Ratcliff.  Because Zane is no longer a public
official, we remand the claim against him to the district court
with instructions to dismiss him from the case as moot.

**AFFIRMED in part and REMANDED in part.**